899 F.2d 79
 31 ERC 1049, 58 USLW 2619, 20 Envtl.
L. Rep. 20,845
 UNITED STATES of America, et al., Plaintiffs, Appellees,
v.
CANNONS ENGINEERING CORP., et al., Defendants, Appellees.
Appeal of OLIN HUNT SPECIALTY PRODUCTS, INC., Defendant.
UNITED STATES of America, et al., Plaintiffs, Appellees,
v.
CANNONS ENGINEERING CORP., et al., Defendants, Appellees.
Appeal of CYN OIL CORP., Defendant.
UNITED STATES of America, et al., Plaintiffs, Appellees,
v.
CANNONS ENGINEERING CORP., et al., Defendants, Appellees.
Appeal of BEGGS & COBB CORPORATION, etc., Defendant.
UNITED STATES of America, et al., Plaintiffs, Appellees,
v.
CANNONS ENGINEERING CORP., et al., Defendants, Appellees.
Appeal of SCOTT BRASS, INC., Defendant.
UNITED STATES of America, et al., Plaintiffs, Appellees,
v.
CANNONS ENGINEERING CORP., et al., Defendants, Appellees.
Appeal of KINGSTON-WARREN CORPORATION, Defendant.
UNITED STATES of America, et al., Plaintiffs, Appellees,
v.
CANNONS ENGINEERING CORP., et al., Defendants, Appellees.
Appeal of CROWN ROLL LEAF, INC., Defendant.
 Nos. 89-1979 to 89-1984.
 United States Court of Appeals,
First Circuit.
 Heard Jan. 10, 1990.
Decided March 20, 1990.
 
 Gregory L. Benik, with whom Gerald J. Petros and Hinckley, Allen, Snyder & Comen, Providence, R.I., were on brief, for defendant Olin Hunt Specialty Products, Inc.
 Robert C. Barber, with whom Duncan A. Maio and Looney & Grossman, Boston, Mass., were on brief, for defendant Cyn Oil Corp.
 Martha V. Gordon, with whom Richard C. Nelson and Merrill & Broderick, Manchester, N.H., were on brief, for defendant Beggs & Cobb Corp.
 John D. Deacon, Providence, R.I., for defendant Scott Brass, Inc.
 Charles J. Dunn, with whom Jeffrey H. Karlin and Wadleigh, Starr, Peters, Dunn & Chiesa, Manchester, N.H., were on brief, for defendant Kingston-Warren Corp.
 Paul S. Samson, with whom Riemer & Braunstein, Boston, Mass., was on brief, for defendant Crown Roll Leaf, Inc.
 J. Carol Williams, Atty., Dept. of Justice, with whom Richard B. Stewart, Asst. Atty. Gen., David C. Shilton, Robert Maher, and Jerry Schwartz, Attys., Dept. of Justice, Washington, D.C., Wayne A. Budd, U.S. Atty., Mark Pearlstein, Asst. U.S. Atty., E. Michael Thomas, Sp. Asst. to the General Counsel, E.P.A., and Audrey Zucker, Asst. Regional Counsel, E.P.A., Boston, Mass., were on brief, for the U.S.
 James M. Shannon, Atty. Gen., and Nancy E. Harper, Asst. Atty. Gen., Boston, Mass., on brief for Com. of Mass., plaintiff, appellee.
 John P. Arnold, Atty. Gen., and George Dana Bisbee, Associate Atty. Gen., Concord, N.H., on brief for State of N.H., plaintiff, appellee.
 Robert S. Sanoff, with whom Laurie Burt and Foley, Hoag & Eliot, Boston, Mass., were on brief, for twenty-five parties comprising "Cannons Sites Group," defendants, appellees.
 Rosanna Sattler and Posternak, Blankstein & Lund, Boston, Mass., on brief for First Londonderry Development Corp. et al., defendants, appellees.
 Peter Cowan and Sheehan, Phinney, Bass & Green, Manchester, N.H., on brief for "Tinkham Parties," so-called, defendants, appellees.
 Before TORRUELLA and SELYA, Circuit Judges, and BOWNES, Senior Circuit Judge.
 SELYA, Circuit Judge.
 
 
 1
 "Superfund" sites are those which require priority remedial attention because of the presence, or suspected presence, of a dangerous accumulation of hazardous wastes. Expenditures to clean up such sites are specially authorized pursuant to 42 U.S.C. Sec. 9611 (1987). After the federal government, through the United States Environmental Protection Agency (EPA),[1] identified four such sites in Bridgewater, Massachusetts, Plymouth, Massachusetts, Londonderry, New Hampshire, and Nashua, New Hampshire (collectively, the Sites), the EPA undertook an intensive investigation to locate potentially responsible parties (PRPs). In the course of this investigation, the agency created a de minimis classification (DMC), putting in this category persons or firms whose discerned contribution to pollution of the Sites was minimal both in the amount and toxicity of the hazardous wastes involved. See 42 U.S.C. Sec. 9622(g) (1987). The agency staked out the DMC on the basis of volumetric shares, grouping within it entities identifiable as generators of less than one percent of the waste sent to the Sites. To arrive at a PRP's volumetric share, the agency, using estimates, constituted a ratio between the volume of wastes that the PRP sent to the Sites and the total amount of wastes sent there.
 
 
 2
 The EPA sent notices of possible liability to some 671 PRPs, including generators and nongenerators. Administrative settlements were thereafter achieved with 300 generators (all de minimis PRPs). In short order, the United States and the two host states, Massachusetts and New Hampshire, brought suits in the United States District Court for the District of Massachusetts against 84 of the PRPs who had rejected, or were ineligible for, the administrative settlement. The suits sought recovery of previously incurred cleanup costs and declarations of liability for future remediation under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. Secs. 9601-9675 (1987). The actions were consolidated.
 
 
 3
 With its complaint, the United States filed two proposed consent decrees. The first (the MP decree) embodied a contemplated settlement with 47 major PRPs, that is, responsible parties who were ineligible for membership in the DMC. This assemblage included certain generators whose volumetric shares exceeded the 1% cutoff point and certain nongenerators (like the owners of the Sites and hazardous waste transporters). The second consent decree (the DMC decree) embodied a contemplated settlement with 12 de minimis PRPs who had eschewed participation in the administrative settlement. As required by statute, notice of the decrees' proposed entry was published in the Federal Register. 53 Fed.Reg. 29,959 (Aug. 9, 1988). No comments were received.
 
 
 4
 The government thereupon moved to enter the decrees. Seven non-settling defendants objected.[2] After considering written submissions and hearing arguments of counsel, the district court approved both consent decrees and dismissed all cross-claims against the settling defendants. United States v. Cannons Engineering Corp., 720 F.Supp. 1027, 1052-53 (D.Mass.1989). The court proceeded to certify the decrees as final under Fed.R.Civ.P. 54(b). Id. These appeals followed.
 
 
 5
 * We approach our task mindful that, on appeal, a district court's approval of a consent decree in CERCLA litigation is encased in a double layer of swaddling. In the first place, it is the policy of the law to encourage settlements. See, e.g., Donovan v. Robbins, 752 F.2d 1170, 1177 (7th Cir.1985); City of New York v. Exxon Corp., 697 F.Supp. 677, 692 (S.D.N.Y.1988). That policy has particular force where, as here, a government actor committed to the protection of the public interest has pulled the laboring oar in constructing the proposed settlement. See F.T.C. v. Standard Financial Management Corp., 830 F.2d 404, 408 (1st Cir.1987) (discussing need for judicial deference "to the agency's determination that the settlement is appropriate"); S.E.C. v. Randolph, 736 F.2d 525, 529 (9th Cir.1984) (similar). While "the true measure of the deference due depends on the persuasive power of the agency's proposal and rationale, given whatever practical considerations may impinge and the full panoply of the attendant circumstances," Standard Financial, 830 F.2d at 408, the district court must refrain from second-guessing the Executive Branch.
 
 
 6
 Respect for the agency's role is heightened in a situation where the cards have been dealt face up and a crew of sophisticated players, with sharply conflicting interests, sit at the table. That so many affected parties, themselves knowledgeable and represented by experienced lawyers, have hammered out an agreement at arm's length and advocate its embodiment in a judicial decree, itself deserves weight in the ensuing balance. See Exxon, 697 F.Supp. at 692. The relevant standard, after all, is not whether the settlement is one which the court itself might have fashioned, or considers as ideal, but whether the proposed decree is fair, reasonable, and faithful to the objectives of the governing statute. See Durrett v. Housing Authority, 896 F.2d 600, 603-04 (1st Cir.1990) (describing district court's task). Thus, the first layer of insulation implicates the trial court's deference to the agency's expertise and to the parties' agreement. While the district court should not mechanistically rubberstamp the agency's suggestions, neither should it approach the merits of the contemplated settlement de novo.
 
 
 7
 The second layer of swaddling derives from the nature of appellate review. Because approval of a consent decree is committed to the trial court's informed discretion, see id. 896 F.2d at 603-04; United States v. Hooker Chemical & Plastics Corp., 776 F.2d 410, 411 (2d Cir.1985); In re AWECO, Inc., 725 F.2d 293, 297 (5th Cir.), cert. denied, 469 U.S. 880, 105 S.Ct. 244, 83 L.Ed.2d 182 (1984), the court of appeals should be reluctant to disturb a reasoned exercise of that discretion. In this context, the test for abuse of discretion is itself a fairly deferential one. We recently addressed the point in the following terms:
 
 
 8
 Judicial discretion is necessarily broad--but it is not absolute. Abuse occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them.
 
 
 9
 Independent Oil & Chemical Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co., 864 F.2d 927, 929 (1st Cir.1988). Unless the objectors can demonstrate that the trier made a harmful error of law or has lapsed into "a meaningful error in judgment," Anderson v. Cryovac, Inc., 862 F.2d 910, 923 (1st Cir.1988), a reviewing tribunal must stay its hand. The doubly required deference--district court to agency and appellate court to district court--places a heavy burden on those who purpose to upset a trial judge's approval of a consent decree.II
 
 
 10
 With this introduction, we turn to our twice-swaddled assessment of the decrees here at issue. In beginning, we abjure an exegetic description of the decrees themselves or of the factual/legal background upon which they are superimposed, instead referring the motivated reader to the district court's comprehensive description of the governments' claims, Cannons, 720 F.Supp. at 1031-32; the administrative settlement, id. at 1033; the MP decree, id. at 1033-34; and the DMC decree, id. at 1034-35. We note only a few of the decrees' historical antecedents.
 
 
 11
 Originally, the EPA extended an open offer to all de minimis PRPs, including five of the six appellants,[3] proposing an administrative settlement based on 160% of each PRP's volumetric share of the total projected response cost, that is, the price of remedial actions, past and anticipated. See id. at 1030 n. 1. The settlement figure included a 60% premium to cover unexpected costs and/or unforeseen conditions. Settling PRPs paid their shares in cash and were released outright from all liability. They were also exempted from suits for contribution, see 42 U.S.C. Sec. 9622(g)(5) (1987).
 
 
 12
 Following consummation of the administrative settlement, plaintiffs entered into negotiations with the remaining PRPs. These negotiations resulted in the proposed MP decree (accepted by 47 "major" defendants) and the DMC decree. The terms of the former have been memorialized in the opinion below, 720 F.Supp. at 1034, and do not bear repeating. The latter was modelled upon the administrative settlement, but featured an increased premium: rather than allowing de minimis PRPs to cash out at a 160% level, an eligible generator could resolve its liability only by agreeing to pay 260% of its volumetric share of the total projected response cost. The EPA justified the incremental 100% premium as being in the nature of delay damages.
 
 
 13
 With this admittedly sketchy background, we proceed with our consideration of the instant appeals, engaging in independent discussion of particular facts and decree provisions only to the extent required to afford needed perspective.
 
 III
 
 14
 The lower court having made extensive, meticulously detailed findings in respect to the consent decrees, see Cannons, 720 F.Supp. at 1035-47, we see no point in repastinating well-ploughed terrain. We choose instead to set forth our general views as to the criteria that a district court should use in determining whether to approve a consent decree in the CERCLA context, explaining in the process why we believe the rulings below to be unimpugnable.
 
 
 15
 Our starting point is well defined. The Superfund Amendments and Reauthorization Act of 1986 (SARA), P.L. 99-499, Sec. 101 et seq., 100 Stat. 1613, authorized a variety of types of settlements which the EPA may utilize in CERCLA actions, including consent decrees providing for PRPs to contribute to cleanup costs and/or to undertake response activities themselves. See 42 U.S.C. Sec. 9622 (1987). SARA's legislative history makes pellucid that, when such consent decrees are forged, the trial court's review function is only to "satisfy itself that the settlement is reasonable, fair, and consistent with the purposes that CERCLA is intended to serve." H.R.Rep. No. 253, Pt. 3, 99th Cong., 1st Sess. 19 (1985), reprinted in 1986 U.S.Code Cong. & Admin.News 3038, 3042. Reasonableness, fairness, and fidelity to the statute are, therefore, the horses which district judges must ride.
 
 
 16
 That said, we are quick to concede that these three steeds are all mutable figures taking on different forms and shapes in different factual settings. Yet, the concepts' amorphous quality is no accident or quirk of fate. We believe that Congress intended, first, that the judiciary take a broad view of proposed settlements, leaving highly technical issues and relatively petty inequities to the discourse between parties; and second, that the district courts treat each case on its own merits, recognizing the wide range of potential problems and possible solutions. When a court considers approval of a consent decree in a CERCLA case, there can be no easy-to-apply check list of relevant factors.
 
 
 17
 A. Procedural Fairness.
 
 
 18
 We agree with the district court that fairness in the CERCLA settlement context has both procedural and substantive components. Cannons, 720 F.Supp. at 1039-40. To measure procedural fairness, a court should ordinarily look to the negotiation process and attempt to gauge its candor, openness, and bargaining balance. See, e.g., id. at 1040; United States v. Rohm & Haas Co., 721 F.Supp. 666, 680-81 (D.N.J.1989); Kelley v. Thomas Solvent Co., 717 F.Supp. 507, 517-18 (W.D.Mich.1989); In re Acushnet River & New Bedford Harbor, 712 F.Supp. 1019, 1031 (D.Mass.1989); Exxon, 697 F.Supp. at 693; State of New York v. Town of Oyster Bay, 696 F.Supp. 841, 844-45 (E.D.N.Y.1988); United States v. Hooker Chemicals & Plastics Corp., 540 F.Supp. 1067, 1080 (W.D.N.Y.1982).
 
 
 19
 In this instance, the district court found the proposed decrees to possess the requisite procedural integrity, Cannons, 720 F.Supp. at 1040-41, and appellants have produced no persuasive reason to alter this finding. It is clear the district court believed that the government conducted negotiations forthrightly and in good faith, and the record is replete with indications to that effect. Most of appellants' contrary intimations are vapid and merit summary rejection. But their flagship argument--that the procedural integrity of the settlement was ruptured because appellants were neither allowed to join the MP decree nor informed in advance that they would be excluded--requires comment.
 
 
 20
 Appellants claim that they were relatively close to the 1% cutoff point, and were thus arbitrarily excluded from the major party settlement, avails them naught. Congress intended to give the EPA broad discretion to structure classes of PRPs for settlement purposes. We cannot say that the government acted beyond the scope of that discretion in separating minor and major players in this instance, that is, in determining that generators who had sent less than 1% of the volume of hazardous waste to the Sites would comprise the DMC and those generators who were responsible for a greater percentage would be treated as major PRPs. While the dividing line was only one of many which the agency could have selected, it was well within the universe of plausibility. And it is true, if sometimes sad, that whenever and wherever government draws lines, some parties fall on what they may perceive as the "wrong" side. See Sprandel v. Secretary of HHS, 838 F.2d 23, 27 (1st Cir.1988) (per curiam). There was no cognizable unfairness in this respect. Moreover, having established separate categories for different PRPs, the agency had no obligation to let defendants flit from class to class, thus undermining the rationale and purpose for drawing lines in the first place.
 
 
 21
 Nor can we say that appellants were entitled to more advance warning of the EPA's negotiating strategy than they received. At the time de minimis PRPs were initially invited to participate in the administrative settlement, the EPA, by letter, informed all of them, including appellants, that:
 
 
 22
 The government is anxious to achieve a high degree of participation in this de minimis settlement. Accordingly, the terms contained in this settlement offer are the most favorable terms that the government intends to make available to parties eligible for de minimis settlement in this case.
 
 
 23
 Cannons, 720 F.Supp. at 1033. Appellants knew, early on, that they were within the DMC and could spurn the EPA's proposal only at the risk of paying more at a later time. Although appellants may have assumed that they could ride on the coattails of the major parties and join whatever MP decree emerged--the government had, on other occasions, allowed such cafeteria-style settlements--the agency was neither asked for, nor did it give, any such assurance in this instance. As a matter of law, we do not believe that Congress meant to handcuff government negotiators in CERCLA cases by insisting that the EPA allow polluters to pick and choose which settlements they might prefer to join. And as a matter of equity, we think that if appellants were misled at all, it was by their own wishful thinking.
 
 
 24
 The district court found the consent decrees to have been the product of fair play. Given that the decrees were negotiated at arm's length among experienced counsel, that appellants (except Crown, see supra note 3) had an opportunity to participate in the negotiations and to join both the first and the second de minimis settlements, and that the agency operated in good faith, the finding of procedural fairness is eminently supportable.
 
 
 25
 B. Substantive Fairness.
 
 
 26
 Substantive fairness introduces into the equation concepts of corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible. See generally Developments in the Law--Toxic Waste Litigation, 99 Harv.L.Rev. 1458, 1477 (1986). The logic behind these concepts dictates that settlement terms must be based upon, and roughly correlated with, some acceptable measure of comparative fault, apportioning liability among the settling parties according to rational (if necessarily imprecise) estimates of how much harm each PRP has done. Cf. Rohm & Haas, 721 F.Supp. at 685 (the most important aspect of judicial review is relationship of settlement figure to proportion of settlor's waste); Cannons, 720 F.Supp. at 1043 (charging more than proportionate liability must be justified in some way, as by unexpected costs or unknown conditions); Kelley, 717 F.Supp. at 517 (approving settlement because it was unlikely that settlor's comparative fault was less than percentage of cleanup costs it agreed to pay); United States v. Conservation Chemical Co., 628 F.Supp. 391, 401 (W.D.Mo.1985) (liability apportionment should be made on basis of comparative fault).
 
 
 27
 Even accepting substantive fairness as linked to comparative fault, an important issue still remains as to how comparative fault is to be measured. There is no universally correct approach. It appears very clear to us that what constitutes the best measure of comparative fault at a particular Superfund site under particular factual circumstances should be left largely to the EPA's expertise. Whatever formula or scheme EPA advances for measuring comparative fault and allocating liability should be upheld so long as the agency supplies a plausible explanation for it, welding some reasonable linkage between the factors it includes in its formula or scheme and the proportionate shares of the settling PRPs. See United States v. Akzo Coatings, 719 F.Supp. 571, 586-87 (E.D.Mich.1989); Acushnet, 712 F.Supp. at 1031: cf. Gardner & Greenberger, Judicial Review of Administrative Action and Responsible Government, 63 Geo.L.J. 7, 33 (1974) (courts must know why an agency has taken an action if they are to perform their review function adequately). Put in slightly different terms, the chosen measure of comparative fault should be upheld unless it is arbitrary, capricious, and devoid of a rational basis.[4] See 42 U.S.C. Sec. 9613(j) (1987); Rohm & Haas, 721 F.Supp. at 681.
 
 
 28
 Not only must the EPA be given leeway to construct the barometer of comparative fault, but the agency must also be accorded flexibility to diverge from an apportionment formula in order to address special factors not conducive to regimented treatment. While the list of possible variables is virtually limitless, two frequently encountered reasons warranting departure from strict formulaic comparability are the uncertainty of future events and the timing of particular settlement decisions. Common sense suggests that a PRP's assumption of open-ended risks may merit a discount on comparative fault, while obtaining a complete release from uncertain future liability may call for a premium. See, e.g., Cannons, 720 F.Supp. at 1043; Superfund Settlements with De Minimis Waste Contributors: An Analysis of Key Issues by the Superfund Settlements Project, May 8, 1987, Vol. XIV Chem. Waste Lit. Rptr. 34, 46 (June 1987) [hereinafter Superfund Settlements ] (premium should be paid by PRP for benefit of being permitted to cash out). By the same token, the need to encourage (and suitably reward) early, cost-effective settlements, see, e.g., Acushnet, 712 F.Supp. at 1032 (quick settlement deserves recognition in terms of lowered settlement figure); United States v. Seymour Recycling Corp., 554 F.Supp. 1334, 1339 (S.D.Ind.1982) (similar), and to account inter alia for anticipated savings in transaction costs inuring from celeritous settlement, cf., e.g., Mathewson Corp. v. Allied Marine Indus., Inc., 827 F.2d 850, 855-56 (1st Cir.1987) (discussing range of considerations influencing private settlements), can affect the construct. Because we are confident that Congress intended EPA to have considerable flexibility in negotiating and structuring settlements, we think reviewing courts should permit the agency to depart from rigid adherence to formulae wherever the agency proffers a reasonable good-faith justification for departure.
 
 
 29
 We also believe that a district court should give the EPA's expertise the benefit of the doubt when weighing substantive fairness--particularly when the agency, and hence the court, has been confronted by ambiguous, incomplete, or inscrutable information. In settlement negotiations, particularly in the early phases of environmental litigation, precise data relevant to determining the total extent of harm caused and the role of each PRP is often unavailable. See Superfund Settlements, supra p. 16, at 43. Yet, it would disserve a principal end of the statute--achievement of prompt settlement and a concomitant head start on response activities--to leave matters in limbo until more precise information was amassed. As long as the data the EPA uses to apportion liability for purposes of a consent decree falls along the broad spectrum of plausible approximations, judicial intrusion is unwarranted--regardless of whether the court would have opted to employ the same data in the same way. See Rohm & Haas, 721 F.Supp. at 685-86 (reasonable relationship to some plausible estimate or range of estimates is standard of fairness).
 
 
 30
 In this instance, we agree with the court below that the consent decrees pass muster from a standpoint of substantive fairness. They adhere generally to principles of comparative fault according to a volumetric standard, determining the liability of each PRP according to volumetric contribution. And, to the extent they deviate from this formulaic approach, they do so on the basis of adequate justification. In particular, the premiums charged to de minimis PRPs in the administrative settlement, and the increased premium charged in the DMC decree, seem well warranted.
 
 
 31
 The argument that the EPA should have used relative toxicity as a determinant of proportionate liability for response costs, instead of a strictly volumetric ranking, is a stalking horse. Having selected a reasonable method of weighing comparative fault, the agency need not show that it is the best, or even the fairest, of all conceivable methods. The choice of the yardstick to be used for allocating liability must be left primarily to the expert discretion of the EPA, particularly when the PRPs involved are numerous and the situation is complex. See H.R.Rep. No. 99-962, 99th Cong., 2d Sess. at 253 (1986) ("[t]he President has the discretion to allocate the total response costs among potentially responsible parties as the President deems appropriate"). We cannot reverse the court below for refusing to second-guess the agency on this score.
 
 
 32
 Appellants' next asseveration--that the decrees favor major party PRPs over their less culpable counterparts--is a gross distortion. While the DMC and MP decrees differ to some extent in application of the volumetric share formula, requiring lower initial contributions under the latter, the good-faith justification for this divergence is readily apparent. In return for the premium paid, de minimis PRPs can cash out, thus obtaining two important benefits: reduced transaction costs and absolute finality with respect to the monetization of their overall liability. Cf. Superfund Settlements, supra p. 16, at 42-43. The major PRPs, on the other hand, retain an open-ended risk anent their liability at three of the Sites, see Cannons, 720 F.Supp. at 1042, making any comparison of proportionate contributions a dubious proposition. At the very least, assumption of this unquantifiable future liability under the MP decree warranted some discount--and the tradeoff crafted by the government's negotiators seems reasonable. Indeed, the acceptance of the first and second DMC settlement offers by so many of the de minimis PRPs is itself an indication of substantive fairness toward the class to which appellants belong. See Seymour, 554 F.Supp. at 1339. On this record, the district court did not misuse its discretion in ruling that the decrees sufficiently tracked the parties' comparative fault.
 
 
 33
 The last point which merits discussion under this rubric involves the fact that the agency upped the ante as the game continued, that is, the premium assessed as part of the administrative settlement was increased substantially for purposes of the later DMC decree. Like the district court, we see no unfairness in this approach. For one thing, litigation is expensive--and having called the tune by their refusal to subscribe to the administrative settlement, we think it not unfair that appellants, thereafter, would have to pay the piper. For another thing, rewarding PRPs who settle sooner rather than later is completely consonant with CERCLA's makeup.
 
 
 34
 Although appellants berate escalating settlement offers as discriminating among similarly situated PRPs, we think that the government's use of such a technique is fair and serves to promote the explicit statutory goal of expediting remedial measures for hazardous waste sites. See 42 U.S.C. Sec. 9622(a) (1987); see also Cannons, 720 F.Supp. at 1037 (emphasizing congressional interest in expedited cleanups); see generally, Note, Superfund Settlements: The Failed Promise of the 1986 Amendments, 74 Va.L.Rev. 123, 126 (1988) (chief congressional purpose of CERCLA was to provide immediate response to threat of uncontrolled hazardous waste). That the cost of purchasing peace may rise for a laglast is consistent with the method of the statute; indeed, if the government cannot offer such routine incentives, there will be little inducement on the part of any PRP to enter an administrative settlement. Of course, the extent of the differential must be reasonable and the graduation neither unconscionable nor unduly coercive, but these are familiar subjects for judicial review in a wide variety of analogous settings. Cf., e.g., United States v. Ven-Fuel, Inc., 758 F.2d 741, 763-64 (1st Cir.1985) (discussing standard of review anent imposition of civil penalty for oil import violation). We believe that the EPA is entitled to make use of a series of escalating settlement proposals in a CERCLA case and that, as the district court ruled, the serial settlements employed in this instance were substantively fair.
 
 
 35
 C. Reasonableness.
 
 
 36
 In the usual environmental litigation, the evaluation of a consent decree's reasonableness will be a multifaceted exercise. We comment briefly upon three such facets. The first is obvious: the decree's likely efficaciousness as a vehicle for cleansing the environment is of cardinal importance. See Cannons, 720 F.Supp. at 1038; Conservation Chemical, 628 F.Supp. at 402; Seymour, 554 F.Supp. at 1339. Except in cases which involve only recoupment of cleanup costs already spent, the reasonableness of the consent decree, for this purpose, will be basically a question of technical adequacy, primarily concerned with the probable effectiveness of proposed remedial responses.
 
 
 37
 A second important facet of reasonableness will depend upon whether the settlement satisfactorily compensates the public for the actual (and anticipated) costs of remedial and response measures. Like the question of technical adequacy, this aspect of the problem can be enormously complex. The actual cost of remedial measures is frequently uncertain at the time a consent decree is proposed. Thus, although the settlement's bottom line may be definite, the proportion of settlement dollars to total needed dollars is often debatable. Once again, the agency cannot realistically be held to a standard of mathematical precision. If the figures relied upon derive in a sensible way from a plausible interpretation of the record, the court should normally defer to the agency's expertise.
 
 
 38
 A third integer in the reasonableness equation relates to the relative strength of the parties' litigating positions. If the government's case is strong and solid, it should typically be expected to drive a harder bargain. On the other hand, if the case is less than robust, or the outcome problematic, a reasonable settlement will ordinarily mirror such factors. In a nutshell, the reasonableness of a proposed settlement must take into account foreseeable risks of loss. See Rohm & Haas, 721 F.Supp. at 680; Kelley, 717 F.Supp. at 517; Acushnet, 712 F.Supp. at 1028; Exxon, 697 F.Supp. at 692; Hooker, 540 F.Supp. at 1072. The same variable, we suggest, has a further dimension: even if the government's case is sturdy, it may take time and money to collect damages or to implement private remedial measures through litigatory success. To the extent that time is of essence or that transaction costs loom large, a settlement which nets less than full recovery of cleanup costs is nonetheless reasonable. See Rohm & Haas, 721 F.Supp. at 680 (interpreting "reasonableness" in light of congressional goal of expediting effective remedial action and minimizing litigation); United States v. McGraw-Edison Co., 718 F.Supp. 154, 159 (W.D.N.Y.1989) (settlement reasonable in light of prospect of protracted litigation as contrasted to expeditious reimbursement and remedy); Acushnet, 712 F.Supp. at 1030 (emphasizing that trial would likely be "complex, lengthy, expensive and uncertain"); Exxon, 697 F.Supp. at 693 (noting benefit of immediate payment to environmental cleanup effort); Seymour, 554 F.Supp. at 1340 (urgency of abating danger to public must be considered). The reality is that, all too often, litigation is a cost-ineffective alternative which can squander valuable resources, public as well as private.
 
 
 39
 In this case, the district court found the consent decrees to be reasonable. Cannons, 720 F.Supp. at 1038-39. We agree. Appellants have not seriously questioned the technological efficacy of the cleanup measures to be implemented at the Sites. Insofar as they contend that the settlements are not designed to assure adequate compensation to the public for harms caused--at times, they seem to argue that the settlements overcompensate--they are whistling past the graveyard. The risks of trial and the desirability for expedition seem to have been blended into the mix. See id. at 1039. Given the totality of the record-reflected circumstances, the lower court's finding of reasonableness strikes us as irreproachable.
 
 
 40
 D. Fidelity to the Statute.
 
 
 41
 Of necessity, consideration of the extent to which consent decrees are consistent with Congress' discerned intent involves matters implicating fairness and reasonableness. The three broad approval criteria were not meant to be mutually exclusive and cannot be viewed in majestic isolation. Recognizing the inevitable imbrication, we turn to the final criterion.
 
 
 42
 We have recently described the two major policy concerns underlying CERCLA:
 
 
 43
 First, Congress intended that the federal government be immediately given the tools necessary for a prompt and effective response to the problems of national magnitude resulting from hazardous waste disposal. Second, Congress intended that those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created.
 
 
 44
 Dedham Water Co. v. Cumberland Farms Dairy, Inc., 805 F.2d 1074, 1081 (1st Cir.1986) (quoting United States v. Reilly Tar & Chemical Corp., 546 F.Supp. 1100, 1112 (D.Minn.1982)). The district court thought that these concerns were addressed, and assuaged, by the proposed settlements. So do we.
 
 
 45
 It is crystal clear that the broad settlement authority conferred upon the EPA must be exercised with deference to the statute's overarching principles: accountability, the desirability of an unsullied environment, and promptness of response activities. The bases appear to have been touched in this instance. Appellants concede that the government made a due and diligent search to uncover the identity of PRPs; the classification of perpetrators and the use of a modified volumetric share formula appear reasonably related to assuring accountability; the settlements will unarguably promote early completion of cleanup activities; and the technical efficacy of the selected remedial measures is not in issue. On this basis, the consent decrees seem fully consistent with CERCLA.
 
 
 46
 One can, of course, conjure up ways in which particular consent decrees, while seemingly fair and reasonable, might nevertheless contravene the aims of the statute. Rather than attempting to catalogue a virtually endless list of possibilities, we address, in terms of what we discern to be the congressional will, certain points raised by the appellants.
 
 
 47
 1. De Minimis Settlements. In the SARA Amendments, Congress gave the EPA authority to settle with a de minimis PRP so long as (i) the agreement involved only a "minor portion" of the total response costs, and (ii) the toxicity and amount of substances contributed by the PRP were "minimal in comparison to the other hazardous substances at the facility." 42 U.S.C. Sec. 9622(g)(1) (1987). The two determinative criteria are not further defined. Appellants, for a variety of reasons, question the boundaries fixed for the DMC class in this instance, contending that drawing lines so sharply, and adhering to those lines so blindly, thwarts CERCLA's legitimate goals.
 
 
 48
 We have already dealt with the burden of this argument, see supra Parts III(A), (B), and need not linger at this juncture. It suffices to say that, had Congress meant the agency to employ a purely mechanical taxonomy, it would have so provided. We believe that Congress intended quite the opposite; the EPA was to have substantial discretion to interpret the statutory terms in light of both its expertise and its negotiating strategy in a given case. Therefore, in attempting to gauge a consent decree's consistency with the statute, courts must give a wide berth to the agency's choice of eligibility criteria. In this case, the criteria selected fell well within the ambit of Executive discretion.
 
 
 49
 2. Disproportionate Liability. In the SARA Amendments, Congress explicitly created a statutory framework that left nonsettlors at risk of bearing a disproportionate amount of liability. The statute immunizes settling parties from liability for contribution and provides that only the amount of the settlement--not the pro rata share attributable to the settling party--shall be subtracted from the liability of the nonsettlors.[5] This can prove to be a substantial benefit to settling PRPs--and a corresponding detriment to their more recalcitrant counterparts.
 
 
 50
 Although such immunity creates a palpable risk of disproportionate liability, that is not to say that the device is forbidden. To the exact contrary, Congress has made its will explicit and the courts must defer. See Exxon, 677 F.Supp. at 694 ("To the extent that the non-settling parties are disadvantaged in any concrete way by the applicability of [42 U.S.C. Sec. 9613(f)(2) ] to the overall settlement, their dispute is with Congress."); Acushnet, 712 F.Supp. at 1032. Disproportionate liability, a technique which promotes early settlements and deters litigation for litigation's sake, is an integral part of the statutory plan.
 
 
 51
 In a related vein, appellants assail the district court's dismissal of their cross-claims for contribution as against all settling PRPs. They contend, in essence, that the district court failed to appreciate that they would potentially bear a greater proportional liability than will be shouldered by any of the settling parties. They claim this result to be both unfair and inconsistent with the statutory plan.
 
 
 52
 As originally enacted, CERCLA did not expressly provide for a right of contribution among parties found jointly and severally liable for response costs. When CERCLA was amended by SARA in 1986, Congress created an express right of contribution among parties found liable for response costs. See 42 U.S.C. Sec. 9613(f)(1) (1987). Congress specifically provided that contribution actions could not be maintained against settlors. See 42 U.S.C. Sec. 9613(f)(2) (1987). This provision was designed to encourage settlements and provide PRPs a measure of finality in return for their willingness to settle. See H.R.Rep. No. 99-253, Part I, 90th Cong., 1st Sess. 80 (1985), reprinted in 1986 U.S.Code Cong. & Admin.News 2835, 2862. Congress plainly intended non-settlors to have no contribution rights against settlors regarding matters addressed in settlement. Thus, the cross-claims were properly dismissed; Congress purposed that all who choose not to settle confront the same sticky wicket of which appellants complain.
 
 
 53
 The statute, of course, not only bars contribution claims against settling parties, but also provides that, while a settlement will not discharge other PRPs, "it reduces the potential liability of the others by the amount of settlement." 42 U.S.C. Sec. 9613(f)(2) (1987). The law's plain language admits of no construction other than a dollar-for-dollar reduction of the aggregate liability. The weight of considered authority so holds. See, e.g., Smith Land & Improvement Corp. v. Celotex Corp., 851 F.2d 86, 89 (3d Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989) (under SARA, a settlement with the government reduces the government's claim against non-settlors "pro tanto"); Rohm & Haas, 721 F.Supp. at 699-700; Acushnet, 712 F.Supp. at 1027; Exxon, 697 F.Supp. at 681 n. 5. This clear and unequivocal statutory mandate overrides appellants' quixotic imprecation that their liability should be reduced not by the amount of settlement but by the equitable shares of the settling parties. In a very real sense, the appellants' arguments are with Congress, not with the district court.[6]
 
 
 54
 3. Indemnity. On a similar note, appellants bemoan the dismissal of their cross-claims for indemnity against the settling PRPs. We are unmoved. Although CERCLA is silent regarding indemnification, we refuse to read into the statute a right to indemnification that would eviscerate Sec. 9613(f)(2) and allow non-settlors to make an end run around the statutory scheme.
 
 
 55
 Appellants allege no contractual basis for indemnification. Their noncontractual indemnity claim, by definition and extrapolation, "is in effect only a more extreme form of [a claim for] contribution." Drake v. Raymark Industries, Inc., 772 F.2d 1007, 1011 n. 2 (1st Cir.1985), cert. denied, 476 U.S. 1126, 106 S.Ct. 1994, 90 L.Ed.2d 675 (1986); accord Zapico v. Bucyrus-Erie Co., 579 F.2d 714, 718-19 (2d Cir.1978). Clearly, if appellants' claims for partial contribution can validly be barred in the course of implementing a CERCLA settlement, see supra Part III(D)(2), their claims for total contribution, i.e., indemnity, can likewise be foreclosed.
 
 
 56
 4. Notice. The appellants also contend that the government's negotiating strategy must be an open book. We disagree. Congress did not send the EPA into the toxic waste ring with one arm tied behind its collective back. Although the EPA may not mislead any of the parties, discriminate unfairly, or engage in deceptive practices, neither must the agency spoon feed PRPs. In the CERCLA context, the government is under no obligation to telegraph its settlement offers, divulge its negotiating strategy in advance, or surrender the normal prerogatives of strategic flexibility which any negotiator cherishes. In short, contrary to the objectors' thesis, the EPA need not tell de minimis PRPs in advance whether they will, or will not, be eligible to join ensuing major party settlements.
 
 
 57
 5. Exclusions from Settlements. The CERCLA statutes do not require the agency to open all settlement offers to all PRPs; and we refuse to insert such a requirement into the law by judicial fiat. Under the SARA Amendments, the right to draw fine lines, and to structure the order and pace of settlement negotiations to suit, is an agency prerogative. After all, "divide and conquer" has been a recognized negotiating tactic since the days of the Roman Empire,[7] and in the absence of a congressional directive, we cannot deny the EPA use of so conventional a tool. So long as it operates in good faith, the EPA is at liberty to negotiate and settle with whomever it chooses.
 
 
 58
 6. Crown. Appellant Crown raises an argument unique to it. The facts are these. In 1986 and thereafter Crown failed to comply with EPA's requests for information and documents concerning the amount and nature of the waste it had sent to the Sites. The information requests were authorized by statute, see 42 U.S.C. Secs. 6927, 9604(e) (1987), and all PRPs were on notice that compliance therewith was a condition precedent to participation in any class settlement. Crown nonetheless disdained compliance. Eventually, the government had to file suit to obtain the information.
 
 
 59
 Crown argues that it was unfairly subjected to a double penalty because withholding the information resulted both in its exclusion from the settlements and in the imposition of bad-faith penalties. We see nothing amiss. EPA's authority to enforce Sec. 3007 of the Resource Conservation and Recovery Act, 42 U.S.C. Sec. 6927 (1987), and CERCLA Sec. 104(e), 42 U.S.C. Sec. 9604(e) (1987), is completely independent of its authority to settle Superfund cases. Conditioning settlement eligibility on a PRP's compliance with an outstanding information request was a perfectly reasonable approach, especially since the data Crown refused to supply was the data necessary to verify the nature and amount of the wastes sent to the Sites, and thus provide a foundation for settlement.
 
 
 60
 We draw this phase of our inquiry to a close. The district court held unequivocally that "the proposed Consent Decrees are consistent with the Constitution and CERCLA." Cannons, 720 F.Supp. at 1037. Appellants have offered no convincing reason why this ruling should be set aside.
 
 IV
 
 61
 Appellants complain that the district court erred in failing to hold an evidentiary hearing on the suitability of the consent decrees. They are wrong.
 
 
 62
 We review a district court's declination to convene an evidentiary hearing on a confirmation motion only for abuse of discretion. Cf., e.g., HMG Property Investors, Inc. v. Parque Industrial Rio Canas, Inc., 847 F.2d 908, 919 (1st Cir.1988) (abuse of discretion standard used in determining whether a hearing was required on entry of default judgment); United States v. DeCologero, 821 F.2d 39, 44 (1st Cir.1987) (same standard for motion for reduction of sentence). We start with the proposition that "motions do not usually culminate in evidentiary hearings." Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1120 (1st Cir.1989) (Aoude II ). That being so, it rests with the proponent of an evidentiary hearing to persuade the court that one is desirable and to offer reasons warranting it. See, e.g., DeCologero, 821 F.2d at 44 (evidentiary "hearings cannot be convened at the whim of a suitor, made available like popsicles in July, just because a passerby would like to have one"). District courts are busy places and makework hearings are to be avoided.
 
 
 63
 In general, we believe that evidentiary hearings are not required under CERCLA when a court is merely deciding whether monetary settlements comprise fair and reasonable vehicles for disposition of Superfund claims. Accord Rohm & Haas, 721 F.Supp. at 686; Acushnet, 712 F.Supp. at 1031 n. 21 ("to grant inevitably lengthy hearings in [CERCLA cases] would either frustrate the express intent of Congress to encourage settlement or negate the benefits of ... settlement"). As in other cases, the test for granting a hearing "should be substantive: given the nature and circumstances of the case, did the parties have a fair opportunity to present relevant facts and arguments to the court, and to counter the opponent's submissions?" Aoude v. Mobil Oil Corp., 862 F.2d 890, 894 (1st Cir.1988) (Aoude I ). In this case, that inquiry must be answered in the affirmative. There was no showing of any substantial need for an evidentiary hearing. The issues were fully argued and compendiously briefed. We have been advised of no particular matter which, fairly viewed, necessitated live testimony. The district court's determination that no evidentiary hearing was required fell well within the realm of the court's discretion. See, e.g., Aoude II, 892 F.2d at 1120; Morales-Feliciano v. Parole Board, 887 F.2d 1, 6-7 (1st Cir.1989); Aoude I, 862 F.2d at 893-94 (describing representative cases).
 
 V
 
 64
 Although the appellants have posited a host of other arguments, we deem discussion of them unnecessary. A district court, faced with consent decrees executed in good faith and at arm's length between the EPA and counselled polluters, must look at the big picture, leaving interstitial details largely to the agency's informed judgment. Once the district court has performed this tamisage, we must, absent mistake of law, be doubly deferential, respecting both the agency's expertise and the trial court's sound discretion. We may still intervene if an abuse of discretion looms--but we will not lightly disturb the lower court's approval of such a decree.
 
 
 65
 In this instance, the district court proceeded with evident care. Its conclusion that the decrees, as proposed, are fair, reasonable, and faithful to CERCLA's purposes is fully supportable. The district court considered the appropriate factors and appears to have weighed them in a completely acceptable manner.
 
 
 66
 We need go no further. Although appellants may suffer adverse effects from the consummation of the settlements embodied in the decrees, those effects stem not from any systemic unfairness but from the combination of Congress' plan and appellants' own conduct (including their negotiating strategy).
 
 
 67
 Affirmed.
 
 
 
 [1]
 Although the relevant statutes grant the authority for administering the environmental laws at issue in this case to the President, he has subdelegated that power to the Administrator of the EPA. See Exec. Order No. 12,316, 46 Fed.Reg. 42,237 (Aug. 14, 1981), as amended by Exec. Order No. 12,418, 48 Fed.Reg. 20,891 (May 5, 1983), as further amended by Exec. Order No. 12,580, 52 Fed.Reg. 2923 (Jan. 23, 1987). For ease in reference, we refer to the EPA as the government actor
 
 
 [2]
 The objectors, all de minimis PRPs, included the six appellants, Olin Hunt Specialty Chemicals, Inc., Cyn Oil Corp., Beggs & Cobb Corp., Scott Brass, Inc., Kingston-Warren Corp., and Crown Roll Leaf, Inc. (Crown). Although all of them raise slightly different combinations of points, their positions are sufficiently alike that, by and large, except in Crown's case, we refrain from identifying particular arguments with particular appellants
 
 
 [3]
 Crown was ineligible to receive the initial offer because of its failure to respond to information requests. See Cannons, 720 F.Supp. at 1040 n. 16
 
 
 [4]
 On this issue, we believe it is appropriate to consider the adequacy of the process. To the extent that the process was fair and full of "adversarial vigor," Exxon, 697 F.Supp. at 693, the results come before the court with a much greater assurance of substantive fairness. See, e.g., Rohm & Haas, 721 F.Supp. at 694 (examining extensive discovery leading to settlement terms); Cannons, 720 F.Supp. at 1045; Acushnet, 712 F.Supp. at 1031; Oyster Bay, 696 F.Supp. at 844; see generally De Long, New Wine for a New Bottle: Judicial Review in the Regulatory State, 72 Va.L.Rev. 399, 417-18 (1986) (suggesting that courts could consider their review obligations fulfilled if they merely assured themselves that agency processes functioned adequately to inform and control discretion)
 
 
 [5]
 The statute provides:
 A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement.
 42 U.S.C. Sec. 9613(f)(2) (1987).
 
 
 [6]
 The veiled constitutional argument sponsored principally by Kingston-Warren does not withstand scrutiny. There is no federal common law right to contribution, Texas Indus., Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 641-42, 101 S.Ct. 2061, 2067-68, 68 L.Ed.2d 500 (1981); Northwest Airlines, Inc. v. Transport Workers Union, 451 U.S. 77, 90-91, 101 S.Ct. 1571, 1580, 67 L.Ed.2d 750 (1981), and hence, no deprivation of any constitutionally protected interest
 
 
 [7]
 The maxim, much cited by Macchiavelli, appears in the original Latin as "divide et impera." It is more accurately translated as "divide and rule."