**UNITED STATES of America, Plaintiff,**

v.

**Russell Martin BLISS, et al.,
Defendants.**

No. 84–200C(1).

United States District Court,
E.D. Missouri, E.D.

Dec. 31, 1990.
As Amended Jan. 3 and Jan. 30, 1991.

See also 132 F.R.D. 58.

Joseph Moore, Asst. U.S. Atty., St. Louis, Mo., Timothy Duggan, Asst. Atty. Gen., Jefferson City, Mo., Ann Strickland, Amy Svoboda, A. Wiley Ray, Arthur Ray, Office of Enforcement & Compliance, E.P.A., Washington, D.C., Martha Steincamp, Cheryle Micinski, Asst. Regional Counsel, U.S. E.P.A., Region VII, Kansas City, Mo., Steven Baer, Env. Enforcement Section, Environment & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for the U.S.

F. William McCalpin, Lewis, Rice & Fingersh, St. Louis, Mo., for Independent Petrochem.

John Cole, Armstrong, Teasdale, Kramer & Vaughn, St. Louis, Mo., Lewis Booker, Hunton & Williams, Richmond, Va., for Syntex.

Ted Perryman, Roberts, Perryman & Bomkamp, St. Louis, Mo., for Northeastern Pharm.

Russell Bliss, St. James, Mo., pro se.

Jerry Russell Bliss, Ballwin, Mo., pro se.

Alan Steinberg, Steinberg & Crotzer, Clayton, Mo., for Bliss.

Timothy Harker, The Harker Firm, Washington, D.C., Alan Kohn, Kohn, Shands, Elbert, Gianoulakis & Giljim, St. Louis, Mo., for American Can.

## MEMORANDUM

NANGLE, Senior District Judge.

This matter is now before the Court on the joint motion of Missouri and the United States to enter two consent decrees formulated in lengthy negotiations with two groups of the principal corporate defendants in this action, the Syntex defendants[1] and the NEPACCO

---

1. Syntex Corporation, Syntex (U.S.A.) Inc., Syntex Laboratories, Inc., and Syntex Agribusiness, Inc. are herein referred to collectively as "the Syntex defendants."

defendants.[2] The consent decrees were lodged with the Court on July 24 and July 26, 1990. In accordance with 42 U.S.C. § 9622(d)(2) and 28 C.F.R. § 50.7, notice of lodging of the consent decrees was published in the Federal Register on August 8, 1990, at 55 Fed.Reg. 32319–20, and a thirty-day comment period followed, in which numerous comments were received. The instant motion is accompanied by copies of all comments and the Environmental Protection Agency's ("EPA") Responsiveness Summary, which contains responses to all submitted comments, including concerns raised by the Cities of Eureka and Fenton, Missouri, in their motions regarding intervention in these cases.

## BACKGROUND

The United States alleges that in the process of manufacturing Agent Orange at its Verona, Missouri plant in 1968 and 1969, Hoffman–Taff, Inc. generated residues containing dioxin and stored them at the plant. It is further alleged that in 1969, Hoffman–Taff was acquired by Syntex (U.S.A.) Inc., which agreed to assume all of Hoffman–Taff's liabilities as of December 31, 1968. Syntex (U.S.A.) ultimately transferred its interest to Syntex Agribusiness. In the early 1970's, chemical manufacturing by NEPACCO at the Verona plant generated dioxin and trichlorophenol ("TCP") by-products which were added to the alleged dioxin wastes left by Hoffman–Taff. Ultimately, NEPACCO arranged for disposal of some of these by-product materials through defendant Independent Chemical Corporation ("IPC"); IPC in turn hired defendant Russell Bliss to dispose of the wastes, which Bliss did by mixing them with waste oil and other substances and spraying them in a number of sites in eastern Missouri. This consolidated litigation concerns twenty-eight such sites that have been found to be contaminated with dioxin and/or TCP in levels considered to warrant health concerns. Several of these sites, including Times Beach, have in fact been found by the EPA to present a potential imminent and substantial endangerment.

The United States has brought certain of the consolidated actions, pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq., and the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq. The State of Missouri has brought others of the consolidated actions, pursuant to CERCLA and Missouri law. In November of 1983, the State of Missouri filed the first of these consolidated cases against the Syntex and NEPACCO defendants, Russell Bliss and Jerry–Russell Bliss, Inc. in reference to the Minker/Stout site. In January of 1984, the United States brought an action against the same defendants and numerous individual landowner defendants with respect to six other sites. By way of its fourth amended complaint, the United States added 21 additional sites to its claims against the generator and transporter defendants in March of 1989, including a claim against Primerica Corporation and American National Can Co. for the Bliss Ellisville Site. The twenty-eighth and final site was added to the mix by a complaint filed by the United States in April, 1990. The three actions in which Missouri is plaintiff were consolidated with the United States' actions before the undersigned in March, 1990.

By its order dated August 7, 1987, this Court found the NEPACCO defendants, IPC, Russell Bliss and Jerry–Russell Bliss, Inc. jointly and severally liable under 42 U.S.C. § 9607 for cleanup costs associated with the six sites named in the original action brought by the United States. Ruling on this partial summary judgment motion entailed considerable exploration and explication of both CERCLA and the facts underlying this litigation. The Court determined that the United States made out an unrebutted prima facie case of liability under CERCLA, having established that each

---

**2.** Northeastern Pharmaceutical and Chemical Company ("NEPACCO"), Edwin B. Michaels, one-time president and director of NEPACCO, and John W. Lee, one-time vice-president and director of NEPACCO, are herein referred to collectively as "the NEPACCO defendants."

of these defendants fell within one of the class of liable persons and that each site was a "facility" at which a "release" or "threatened release" of a "hazardous substance" was occurring, causing the United States to incur response costs. No liability has yet attached to the Syntex defendants. The proposed consent decrees, if entered, would resolve all pending issues in the consolidated cases concerning the Syntex and NEPACCO defendants.

Certain response actions have already been taken in various sites, including investigation, evaluation, excavation and temporary storage of contaminated soil. In Times Beach, the largest of the twenty-eight sites in terms of both geographic size and the volume of contaminated wastes, excavation has not yet been done. Permanent remedies, including the destruction of contaminated materials and site restoration, have yet to be undertaken. The United States, the State of Missouri and all defendants who are party to the proposed Syntex consent decree agree that:

> the remedial action plan adopted by EPA and embodied [in the consent decree] will attain a degree of cleanup of hazardous wastes, hazardous substances, pollutants and contaminants released or threatened to be released into the environment and [a degree of] control of further actual and threatened releases which at a minimum assures protection of public health, welfare and the environment at the sites.

Syntex consent decree, ¶ 7. The Court agrees with the United States and the State of Missouri that the consent decrees now before the Court present a "comprehensive resolution of the dioxin problem in eastern Missouri." Memorandum of Points and Authorities in Support of Joint Motion, p. 4.

## THE SUBSTANCE OF THE SYNTEX CONSENT DECREE

### I. *Overview*

The Syntex consent decree, in effect, establishes a division of the labor necessary to complete remediation of all twenty-eight sites. Under the terms of the decree, the United States, with Missouri's support, will undertake all further necessary remedia-

tion and restoration of all sites but Times Beach. For their part, the Syntex defendants will be responsible for all remediation and restoration of Times Beach, including the installation and operation of a temporary incinerator to be used for the thermal treatment of dioxin-contaminated materials from all twenty-eight sites. The Syntex defendants' obligations at the Times Beach site will be performed at *their* expense, and the cost of the incineration alone has been estimated to exceed $80 million. *See* Table A–9 in EPA's September 28, 1988, Record of Decision ("ROD") concerning Times Beach. In addition, the consent decree requires the Syntex defendants to pay the United States $10 million in five annual installments of $2 million each, commencing no later than April 1, 1991, in settlement of claims for costs incurred by the United States in connection with the twenty-eight sites.

The consent decree is exhaustive in its specifications for the work to be performed. The decree, itself in excess of fifty pages, is supplemented with a site administration workplan, a demolition workplan, a site remediation workplan, a CERCLA delisting petition, a thermal treatment workplan, and a site restoration workplan, all of which are incorporated into the consent decree itself and explicitly enforceable. *See* ¶¶ 11.Y, 14.E and 18. This Court has reviewed all of this material (which effort required a considerable expenditure of time). Every step in the "cleanup" process is elaborately detailed in various workplans and other documents viewed by the Court. This same information has been available for public review for months (although most of the protests indicate that the writers did not avail themselves of this opportunity).

In any event, the Court will undertake to explain, in laymen's terms, certain aspects of the proposed clean-up, particularly those which, because unknown to or misunderstood by the public, have caused the greatest concern among those who submitted comments on the consent decree. The Court notes that the vast majority of submitted comments came from citizens of

Eureka and Fenton, and appeared to be variants of several form letters; these largely reiterated over and over a handful of concerns, not supported by any scientific or technical authority, which the EPA has addressed in its Responsiveness Summary and elsewhere, and which the Court addresses below.

## II. *The Times Beach Cleanup*

Contrary to popular opinion, neither the State of Missouri nor the United States has "bargained away" its prerogative with regard to applicable laws or regulations requiring permits for the operation at Times Beach. Paragraph 15 of the Syntex consent decree requires that each party apply for "all permits necessary for the performance of its obligations under this Decree and the Work Plans." That paragraph further specifically requires the Syntex defendants to secure a RCRA/Missouri Hazardous Waste Law permit for the incinerator facility, and requires that the permit be limited to the treatment of dioxin-contaminated materials from the twenty-eight sites.

Section 6 of the Thermal Treatment Workplan requires, in addition to the RCRA/Missouri Hazardous Waste Law permit, that the thermal treatment project be conducted only with a CERCLA delisting petition for residues generated by the thermal treatment, a St. Louis County Department of Health air/construction/operating permit and a National Pollutant Discharge Elimination System Permit for discharge of wastewater and contaminated stormwater. The consent decree requires these permits despite the fact that, under 42 U.S.C. § 9621(e)(1), "[n]o Federal, State, or local permit shall be required for the portion of any removal or remedial action conducted entirely onsite...."

Given that much of Times Beach is located in the five-year flood plain of the Meramec River, flood control measures are of great concern. The consent decree requires the construction of a ring levee around the incinerator and "ancillary operations." The U.S. Army Corps of Engineers has reviewed and approved the conceptual design of the ring levee as set forth in the workplans, and will oversee its final design and construction. The height of the levee will include three feet of freeboard above the 100-year flood height. In the unlikely event that a flood should exceed the levee's capacity, the incinerator's emergency shut-down capability will come into play. Furthermore, all contaminated soil handling operations will be in fully enclosed structures, further reducing the potential for the release of any contaminants into flood waters.

The consent decree requires a greater level of cleanup of Times Beach itself than was announced in the ROD concerning Times Beach. The originally selected remedy, found in the ROD, called for excavation and thermal treatment of soil contaminated in excess of 20 parts per billion ("ppb"). The settlement negotiations from which the consent decree comes led to an enhancement of the cleanup level to require excavation and incineration of all soil exceeding 5–10 ppb, followed by placement of a one-foot cover of clean soil or a clean soil/delisted ash mixture over any remaining soil exceeding 1 ppb. The parties represent to the Court that that degree of cleanup meets the Center for Disease Control's recommended level for residential sites.

Many comments indicate the public's mistrust of the temporary nature of the incinerator operations at Times Beach and their being limited to treatment of wastes from the 28 sites. The consent decree and workplans specifically provide a timetable in which the clean-up is to be done (see Part IV below) and require the decontamination, dismantling and removal of the incinerator within a specified period of time after the consent decree's purposes are fulfilled. Failure to meet the deadlines established in the consent decree for dismantling the incinerator would subject the Syntex defendants to penalties up to $10,000.00 per day. *See* ¶ 63. Such failures could well lead to Court intervention if necessary.

Furthermore, ¶ 14.I of the consent decree specifically provides:

The Parties agree and covenant that all remedial actions provided for by this Decree are limited to eastern Missouri Sites alleged by plaintiffs to have been contaminated as a result of actions attributable to Russell Martin Bliss or persons or business entities associated with him; and that the thermal treatment unit will be removed at the conclusion of the incineration of materials from those Sites in accordance with the Work Plan.

The express limitation on the RCRA/Missouri Hazardous Waste Law permit to treatment of materials from the 28 sites is still further assurance that incineration at Times Beach will be temporary and limited to the scope of the consent decree.

The Court is persuaded of the appropriateness of Times Beach as the site for incineration of materials from the 28 sites. As earlier noted, Times Beach is the largest of the twenty-eight sites in terms of both geographic size and the volume of its contaminated wastes. "Local" incineration at each site of the contaminated materials there found is not feasible or practicable. The time, expense, logistics and multiplication of risk involved are prohibitive. Some of the sites are not large enough to house a thermal treatment unit. Incineration of all the wastes at one site is preferable to multiple treatment operations, and Times Beach is the best choice for consolidated treatment, for a number of reasons, including: (1) its size, (2) the fact that it has the largest concentration of contaminated waste which then need not be transported elsewhere for treatment, and (3) the fact that it has already been evacuated, but not yet cleaned up and restored.

The Syntex defendants' performance of their obligations under the consent decree is subject to extensive supervision and monitoring by both the United States and the State of Missouri. Federal regulations and the permits under which the incineration project will operate require monitoring, much of it continuous, of a number of areas of concern, including combustion and its outputs, emissions, and emergency systems. As a preliminary matter, EPA, in consultation with the State, must approve all selections of contractors and subcontractors to be used on the Times Beach project. The Syntex defendants must, pursuant to ¶¶ 26–27 of the consent decree, notify the United States and the State in advance of any sample collection activity and make available to them "the results of all sampling and/or tests or other data generated ... with respect to the implementation of [the] decree." Finally, pursuant to 42 U.S.C. § 9621(c), EPA will review the "remedial action" taken at Times Beach at least every five years "to assure that human health and the environment are being protected."

The Syntex defendants are responsible for the demolition and disposal of aboveground structures at Times Beach, as well as the consolidation of automobiles, appliances, trash and debris, much of which will be compacted and disposed of, as environmentally appropriate, in demolition landfill cells in Times Beach. *See* Demolition Workplan. Contaminated and non-contaminated materials will be sorted and treated appropriately. The Demolition Workplan also contains extensive provisions for the appropriate demolition, disposal or other treatment of noncontaminated roadways, utilities, underground storage tanks and water wells in Times Beach. Certain buildings and noncontaminated roadways will remain. The Site Restoration Workplan provides for grading, seed bed preparation, seeding and mulching of the exposed uncontaminated soils that result from the cleanup activity at Times Beach so as to establish a "vegetative cover" of the land.

### III. *The Remaining Sites*

In connection with the consent decrees, the EPA has formulated and submitted as Attachment C its Transportation Work Plan for the Eastern Missouri dioxin sites. This attachment includes a summary of the workplan with respect to sites other than Times Beach, including criteria for the selection of routes for hauling soils from each of the sites to Times Beach, potential haul routes from each site, a spill contingency plan, and the excavation plan for the remaining sites. The Court here attempts

to summarize the substance of the workplan and outline the EPA's responsibilities with respect to the sites other than Times Beach.

At eight of the twenty-seven remaining sites, dioxin-contaminated soils have been excavated and placed in interim storage at their respective sites pending thermal treatment at Times Beach. The volume of this soil is, of course, known. At one of these eight, the Piazza Road site, further excavation may be required as to a portion of the site excluded from the previous excavation. For most of the nonexcavated sites, the EPA has been able to estimate the volume of contaminated soil to be excavated and treated at Times Beach.

Soil cleanup levels for the remaining sites will be established by the EPA, and all soils requiring removal to meet health-based levels will be excavated and transported to Times Beach for thermal treatment. The EPA will be responsible for excavation of soils contaminated in excess of the cleanup levels established. A restoration plan approved by the EPA and the Missouri Department of Natural Resources will be put into effect, such plan to include replacing soil, roads, landscaping and structures such as sidewalks and fences.

Final route selection is to be made by the EPA in accordance with the criteria and procedure set out in the Transportation Work Plan. The criteria used in determining appropriate routes include such factors as distance travelled, pavement strength, capacity and condition, road geometry and other safety considerations, volume of traffic and avoidance of dense residential or commercial zones.

The soil will be transported in standard open bed dump trucks, lined with a plastic liner that will enclose the load and be sealed on top. A canvas tarp will then be secured with ropes covering the entire truck bed. Much of the soil to be transported is already enclosed in polyethylene-lined, polypropylene bags. Only drivers with at least five years' experience with the type of vehicle to be used, with an accident-free commercial driving record, and with appropriate OSHA health and safety training will be used. Trucks will be decontaminated after leaving a contaminated zone at any site, and again after delivery of their loads to Times Beach.

The Syntex consent decree provides for a formulaic cost sharing between the two governments as to those response costs incurred by the United States and not reimbursed by the Syntex defendants. *See* ¶¶ 14.D & 47. Missouri is to pay 10% of the United States' total remediation costs minus a certain percentage of reimbursement by the Syntex defendants out of their $10 million payment to the United States under the consent decree.

IV. *The Timetable*

The consent decree, via the workplans, sets a timetable for the cleanup to be undertaken by the Syntex defendants. Part XXI of the decree sets stipulated escalating per-day monetary penalties for any period of delay in meeting the various temporal "milestones" enumerated in the workplans.[3] The penalty for failing to meet any milestone during the course of the project is excused if the Syntex defendants timely achieve their final milestone under the workplans. Any fines paid are to be placed in EPA's well-known Hazardous Substances Superfund.

The decree sets out the plaintiffs' reservation of rights with respect to any additional response actions that are discovered after the entry of the consent decree to be required at any of the sites.[4] In the event that previously unknown conditions or new

---

3. For example, five days' delay in meeting Milestone 1, which concerns the initiation of demolition of certain structures at Times Beach within prescribed deadlines, would cost the Syntex defendants $2500.00. Forty five days' delay would cost them $136,000.00.

4. Notwithstanding this reservation of rights, the Syntex defendants will be granted a Special Covenant Not to Sue under 42 U.S.C. § 9622(f)(2)(B), i.e., a release not subject to reopening, as to "all materials whose hazardous constituents are treated so as to be destroyed, eliminated or permanently immobilized." Memorandum of Points and Authorities in Support of Joint Motion, p. 7.

information indicate that further remedial action is necessary and appropriate to assure protection of public health, welfare and the environment, *see* ¶ 78 of the decree, the United States and the State will remain free:

> to institute proceedings in this action or in a new action or to issue an Administrative Order seeking to compel any person, including the Settling Defendants, to perform any additional response actions at any Facility or to reimburse the United States or the State for additional response actions....

Syntex consent decree, ¶ 76.

### THE SUBSTANCE OF THE NEPACCO CONSENT DECREE

The NEPACCO consent decree provides that, in settlement of the plaintiffs' claims against the NEPACCO defendants under CERCLA, RCRA and other federal and state laws, the NEPACCO defendants will pay the plaintiffs $225,000.00 within thirty days of entry of the consent decree. That amount plus $10,000.00 to be held in reserve is attested by both the NEPACCO defendants and their insurer to exhaust the NEPACCO defendants' property damage insurance coverage.

Ninety percent of the payment, $202,500.00, is to be paid to the United States, $2,500.00 in partial satisfaction of past response costs and the remaining $200,000.00 in partial satisfaction of potential claims by the Department of the Interior for natural resource damages pursuant to 42 U.S.C. § 9607(a)(4)(C). See ¶ 14 of the NEPACCO consent decree. The amounts paid to the United States will help fund studies by the Department of the Interior to assess the extent of any natural resource damages caused by the Bliss-sprayed dioxin. Ten percent, or $22,500.00, will be paid to the State of Missouri in partial satisfaction of the State's claims in the consolidated actions.

Part VI of the NEPACCO decree provides for a discretionary covenant not to sue, pursuant to 42 U.S.C. § 9622(f)(1), subject to reopener should previously unknown conditions or information reveal that further remedial action is necessary to protect human health, welfare and the environment.

### NON–SETTLING DEFENDANTS' COMMENTS ON THE PROPOSED CONSENT DECREES

Independent Petrochemical Company ("IPC"), another defendant in the consolidated actions, submitted comments in opposition to both consent decrees. The Court agrees with plaintiffs that the gravamen of IPC's comments on the Syntex decree is that the EPA used an "irrational estimation of the risks presented by materials at the sites" and have thus "greatly overestimat[ed] the amount of cleanup required to reduce the 'risk' to a minimal level." Comments of IPC on Proposed Syntex Consent Decree, p. 7. IPC's objection to an over-protective remedy is that it may ultimately, in the form of contribution sought by the Syntex defendants, cost IPC more money than less protective remedies. The Court gives this objection short shrift: the Court is pleased, frankly, to hear IPC opine, with (unlike most of the filed comments) purported scientific support, that the proposed cleanup is overly conservative, and the Court is hardly persuaded that IPC's self-interest should derail such a carefully negotiated solution to the Bliss dioxin mess.

Out of a similar motive, IPC complains that the deal struck by the plaintiffs and the Syntex defendants leaves IPC with too large a share of the remaining costs of the dioxin cleanup, specifically, the costs incurred by the EPA, which total an estimated $70–$100 million. Even were the Court eager to second-guess the apportionment of liability represented by the consent decree, which it is not[5], the Court would not be inclined to accept IPC's argument, as the cost of the Syntex defendants' "bargain" has been estimated to exceed $80 million

---

**5.** This is particularly so given that the Court has already found IPC jointly and severally liable for cleanup costs as to six of the sites, *see* the Court's August 7, 1987, order and memorandum. No such finding has ever been made with respect to the Syntex defendants.

for the incineration alone. *See* Table A–9 of the 9/28/88 ROD.

As to the NEPACCO decree, IPC argues that the alleged limits of NEPACCO's insurance coverage, which form the basis for the monetary settlement embodied in the consent decree, have not been adequately demonstrated. Plaintiffs appear to have assured themselves on this point by declarations of the insurer and the NEPACCO defendants themselves, and the Court is satisfied, if plaintiffs are, that the declarations adequately support the settlement agreement. The Court further agrees that plaintiffs are not without recourse to modify the consent decree in light of any future indication that the declarations were untrue.

Two other defendants, American National Can Company and Primerica Corporation, have also submitted one page of comments, in which the only relevant comment is their bald assertion, without explication, that the Syntex consent decree is not consistent with the National Contingency Plan ("NCP"). As explained by plaintiffs, "[t]he NCP, 40 CFR Part 300 (March 8, 1990), is EPA's generic compilation of rules promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, for the management of Superfund clean-ups." Memorandum of Points and Authorities in Support of Joint Motion, p. 21. Treating this comment with the same degree of specificity with which it is made, the Court, having monitored the entire remedy selection process, is unpersuaded that it has been done in such a way as to violate the NCP. *See* particularly EPA's Responsiveness Summary.

## THE LEGAL STANDARDS GOVERNING ENTRY OF THE CONSENT DECREES

█ A court's approval of a consent decree is discretionary, but the court's role is limited:

"The initial decision to approve or reject a settlement proposal is committed to the sound discretion of the trial judge." *Officers for Justice v. Civil Service Commission,* 688 F.2d 615, 625 (9th Cir.1982) . . . Unless a consent decree is unfair, inadequate, or unreasonable, it ought to be approved.

*Securities and Exchange Commission v. Randolph,* 736 F.2d 525, 529 (9th Cir.1984). Although charged with ensuring that the consent decree adequately protects the interests of the parties and the public, "[j]udges should not substitute their own judgment as to optimal settlement terms for the judgment of the litigants and their counsel." *Armstrong v. Board of School Directors,* 616 F.2d 305, 315 (7th Cir.1980). *See also Citizens for a Better Environment v. Gorsuch,* 718 F.2d 1117, 1125–26 (D.C.Cir.1983).

The courts have long recognized that public policy favors settlements as a cost-efficient and convenient means of resolving disputes and conserving judicial resources. *See, e.g., Kiefer Oil & Gas Co. v. McDougal,* 229 F. 933 (8th Cir.1915). In the environmental context, CERCLA itself favors the use of settlement agreements under which potentially responsible parties will perform response actions:

The President, in his discretion, may enter into an agreement with any person (including the owner or operator of the facility from which a release or substantial threat of release emanates, or any other potentially responsible person), to perform any response action . . . if the President determines that such action will be done properly by such person. Whenever practicable and in the public interest, as determined by the President, the President shall act to facilitate agreements under this section that are in the public interest and consistent with the National Contingency Plan in order to expedite effective remedial actions and minimize litigation.

42 U.S.C. § 9622(a).

Cleanup plans embodied in consent decrees possess numerous advantages. Bypassing the time and expense required by litigation is an obvious plus. Cleanups funded and conducted by potentially responsible parties under a consent decree relieve the government of considerable burdens on its limited resources. Further, negotiated solutions are born of a desirable

cooperation among the parties concerning the complex technical aspects of the remedial action.

The policy in favor of settlements "has particular force where, as here, a government actor committed to the protection of the public interest has pulled the laboring oar in constructing the proposed settlement." *United States v. Cannons Engineering Corp.*, 899 F.2d 79, 84 (1st Cir. 1990). As the First Circuit has pointed out with respect to consent decrees under § 9622:

> SARA's [6] legislative history makes pellucid that, when such consent decrees are forged, the trial court's review function is only to "satisfy itself that the settlement is reasonable, fair, and consistent with the purposes that CERCLA is intended to serve." H.R.Rep. No. 253, Pt. 3, 99th Cong., 1st Sess. 19 (1985), *reprinted in* 1986 U.S.Code Cong. & Admin.News 3038, 3042.

*Id.* 899 F.2d at 85.

■ This Court adopts the First Circuit's well-reasoned rubric for entry of a CERCLA consent decree, in which the four elements are procedural fairness, substantive fairness, reasonableness, and fidelity to the statute. *Id.* at 86–93. As for procedural fairness, the First Circuit directed that: "To measure procedural fairness, a court should ordinarily look to the negotiation process and attempt to gauge its candor, openness, and bargaining balance." *Id.* at 86.

The element of substantive fairness "introduces into the equation concepts of corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible." *Id.* at 87. Nonetheless, in view of the Court's limited role in approving a consent decree:

> It appears very clear ... that what constitutes the best measure of comparative fault at a particular Superfund site under particular factual circumstances should be left largely to the EPA's expertise ... Put in slightly different terms, the cho-

sen measure of comparative fault should be upheld unless it is arbitrary, capricious, and devoid of a rational basis.

*Id.* The First Circuit recognized numerous considerations supporting departure from the general apportionment rule, e.g., the assumption of uncertain future liability by a potentially responsible party ("PRP") and especially prompt and time-saving settlement.

■ The notion of reasonableness encompasses several related considerations: the technical adequacy of the remedies proposed and the adequacy of the settling defendants' obligations to cover the response costs, particularly as weighed against the savings represented by settlement over litigation. *Id.* 899 F.2d at 90. Lastly, a consent decree should be examined for its fidelity to CERCLA's "overarching principles: accountability, the desirability of an unsullied environment, and promptness of response activities." *Id.* at 91.

■ Whether an evidentiary hearing on the suitability of the consent decrees is warranted is to be determined by this Court in the educated exercise of its discretion. *Id.* at 93. As the First Circuit noted, "We start with the proposition that 'motions do not usually culminate in evidentiary hearings.' District courts are busy places and makework hearings are to be avoided." *Id.* at 94, *quoting Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1120 (1st Cir.1989). A hearing should be held only where it is necessary in the circumstances for the parties' fair opportunity to present facts and arguments and to counter opposition to the decrees. *Id.*

The would-be intervenors and many opponents of the proposed cleanup apparently fail to understand the nature of the consent decrees herein. Once entered by this Court, the decrees have the full force and effect of any other order of a court of law and are enforceable thereby. Paragraph 97 of the Syntex consent decree and ¶ 34 of

---

**6.** The Superfund Amendments and Reauthorization Act of 1986, P.L. 99–499, § 101 *et seq.,* 100 Stat. 1613.

the NEPACCO consent decree specifically provide that this Court retains jurisdiction in order to, among other things, enforce compliance with the consent decrees' terms. Under ¶ 93 of the Syntex consent decree and ¶ 30 of the NEPACCO consent decree, material modifications of the decrees are subject to approval by the Court. These decrees carry with them all the power the Court has!

### THE COURT'S FINDINGS AND CONCLUSIONS

■ First, the Court perceives no basis for an evidentiary hearing. The basis for the Court's determination on this point is aptly summarized by the *Cannons Engineering* court: "There was no showing of any substantial need for an evidentiary hearing. The issues were fully argued and compendiously briefed. [The Court has] been advised of no particular matter which, fairly viewed, necessitated live testimony." *Id.* 899 F.2d at 94. The Court has been provided with every conceivable piece of information necessary to its decision. More than likely any hearing would only develop into a political exercise and would not further enlighten the Court.

■ This Court's long and intense familiarity with the dealings between the parties to the consent decrees persuades the Court that the conduct of each set of negotiations has been characterized by procedural integrity. With respect to both decrees, the parties have dealt with one another at arm's length and in good faith. The criticisms of third-parties and some co-defendants concerning the secrecy in which these negotiations were conducted does not, in the Court's opinion, vitiate the finding of procedural fairness:

> In the CERCLA context, the government is under no obligation to telegraph its settlement offers, divulge its negotiating strategy in advance, or surrender the normal prerogatives of strategic flexibility which any negotiator cherishes ... The CERCLA statutes do not require the agency to open all settlement offers to all PRPs; and we refuse to insert such a requirement into the law by judicial fiat ... So long as it operates in good faith, the EPA is at liberty to negotiate and settle with whomever it chooses.

*Id.* 899 F.2d at 93. The confidentiality of the negotiations does not have any bearing on the "candor, openness, and bargaining balance" as between the parties to the negotiation, as to which the Court is fully satisfied.

■ The Court is equally satisfied that the consent decrees meet the criterion of substantive fairness. The convoluted factual and procedural histories of the Eastern Missouri dioxin litigation make a proportional approximation of each defendant's liability difficult, given the number and types of defendants, the number of sites and the stage of the consolidated litigation. Each manufacturer defendant's share of the contaminated wastes cannot be estimated with much exactitude. Neither is comparative fault readily apportionable among the various defendants who had a role in the disposal of the wastes or the landowner defendants.

The Court can be guided, however, by the fact that the NEPACCO defendants and IPC have been adjudicated jointly and severally liable under 42 U.S.C. § 9607 and no liability has yet attached to the Syntex defendants. As earlier noted, the only party to oppose the entry of the decrees on a substantive fairness basis is IPC, which complains that the decrees leave too large a share of costs looming over its head. But "[t]hat the cost of purchasing peace may rise for a laglast is consistent with the method of [CERCLA]." *Id.* 899 F.2d at 89. Further, IPC has underestimated the cost to the Syntex defendants of their obligations under the consent decree, which will likely equal or exceed IPC's estimation of the costs a portion of which it may ultimately assume. In sum, the Court finds that the EPA's apportionment of liability for purposes of the consent decrees "falls along the broad spectrum of plausible approximations," and so should not be judicially disturbed or second-guessed. *Id.* 899 F.2d at 88.

■ The Court's findings with respect to the technical adequacy of the remedies

embodied in the consent decrees is largely expressed in its treatment above of the substance of the two decrees. Based on its careful perusal of the entire record, including the decrees themselves and the accompanying workplans, the ROD, the various responsiveness summaries and all other available data, the Court is persuaded not only that the incineration plan was not arbitrarily or capriciously selected, but that it is in fact technically sound, appropriate and sufficient for the remediation of the twenty-eight sites. The Court further believes the consent decrees' apportionment of the costs is reasonable, based as it is on arm's length negotiations between major PRPs and the prospect of a comprehensive solution to the Eastern Missouri dioxin problem. The criterion of reasonableness is thus met by both decrees.

 Lastly, the Court deems the cumulative effect of these various findings to dictate a final conclusion that the three-fold objectives of CERCLA are well-served by entry of the proposed consent decrees. The obligations of the settling defendants thereunder are appropriate and further the goal of holding responsible parties accountable in reasonable measure for their environmental misdeeds. The proposed cleanup promises a welcome end to the known contamination at the twenty-eight sites under strict guidelines which serve the aim of expeditious response activities.

The Court having carefully considered the factual background of this consolidated litigation, the substance of the two proposed consent decrees, the comments of opposing parties and interested citizens and the legal standards governing entry of the decrees, and having made the necessary findings and conclusions, the Court grants the joint motion of the United States and the State of Missouri to enter consent decrees and final orders between the United States and the State of Missouri and the Syntex and NEPACCO defendants.