863 F.Supp. 1001 (1994)
UNITED STATES of America, Plaintiff,
v.
UNION ELECTRIC COMPANY, et al., Defendants.
STATE OF MISSOURI, Plaintiff,
v.
UNION ELECTRIC COMPANY, et al., Defendants.
Nos. 1:92CV00078GFG, 1:92CV00088GFG.
United States District Court, E.D. Missouri, Southeastern Division.
August 19, 1994.
*1002 Madeline B. Cole, Office of U.S. Atty., St. Louis, MO, Barry M. Hartman, U.S. Dept. of Justice, Washington, DC, Sarah Toevs-Sullivan, U.S. EPA, Region VII, Kansas City, MO, Amy Svoboda, U.S. EPA, Office of Enforcement, Washington, DC, for U.S.
John F. Cowling, George M. Von Stamwitz, Armstrong and Teasdale, Alphonse McMahon, Peper and Martin, St. Louis, MO, for Union Elec. Co.
Alphonse McMahon, Peper and Martin, St. Louis, MO, for all other defendants.
*1003 Alphonse McMahon, Peper and Martin, St. Louis, MO, Warren D. Krebs, Parr and Richey, Indianapolis, IN, for Wayne-White Counties Elec. Co-op.
Joseph G. Nassif, Sr., Partner, Bruce D. Ryder, Partner, Linda W. Tape, Associate, Coburn and Croft, St. Louis, MO, for intervenor plaintiffs.
Shelley A. Woods, Asst. Atty. Gen., Jefferson City, MO, for the State of Mo.

ORDER AND MEMORANDUM
GUNN, District Judge.
This matter is before the Court on parties' motions to intervene and deny entry of consent decree, and on the United States' motion to enter consent decree.

I. Background
In June 1992, the United States filed suit against 179 potentially responsible parties (PRPs) for injunctive relief and the recovery of costs for the cleanup of the Missouri Electric Works, Inc. Superfund Site (Site) pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9606, 9607. During the following month, the State of Missouri filed suit against the same 179 PRPs. The two cases were subsequently consolidated.
The United States also lodged a consent decree with the Court, which had been executed by the United States, the State of Missouri, and the 179 PRPs. Notice of the consent decree was published in the Federal Register on July 14, 1992, and a 30-day period of public comment followed. At that time, some non-settling PRPs voiced their objections to the consent decree. Then, on November 5, 1992, some non-settling PRPs (hereinafter the Intervenors) filed a motion to intervene and a motion to deny entry of the consent decree.
The Superfund Site at issue is located in Cape Girardeau, Missouri, and is owned by Missouri Electric Works, Inc., (MEW) an electrical equipment sale and repair shop. Apparently, solvents, hazardous chemicals, and electrical equipment, including thousands of transformers containing oil, contaminated with polychlorinated biphenyl (PCB), had been disposed of at the MEW Site, adjacent to the shop.
The Environmental Protection Agency's (EPA) investigations of the Site began in the mid-1980s, and in 1988, EPA and a group of PRPs formed the Missouri Electric Works Steering Committee (MEWSC) through an Administrative Order on Consent to conduct a remedial investigation/feasibility study at the MEW Site. From 1988-1991, EPA sent general notices to all PRPs. EPA also sent special notice letters inviting PRPs to participate in settlement negotiations. From March until September of 1991, the federal government, the state of Missouri, and MEWSC negotiated the terms of a consent decree. EPA sent a copy of the proposed decree to all PRPs and invited their participation at the end of September, 1991.
The Intervenors are service shop owners[1] who either sold transformers directly to MEW for resale, sold transformers to third parties who resold them to MEW or sent transformers owned by others to MEW for repair. They are unwilling to join in the consent decree because they believe that the formula developed by MEWSC for allocating the cost of cleanup inequitably attributes to them a disproportionate share of liability.

II. Motion to Intervene
The Intervenors claim that they are entitled to intervene as a matter of right pursuant to either CERCLA § 113(i) or Rule 24(a)(2). 42 U.S.C. § 9613(i) (1988); Fed. R.Civ.P. 24(a). Alternatively, they ask this Court in its discretion to allow intervention pursuant to Rule 24(b). Fed.R.Civ.P. 24(b).

A. Intervention of Right
Intervention of right can occur in one of two ways. First, under Rule 24(a)(2), a party can intervene as a matter of right "[u]pon timely application ... when the applicant claims an interest relating to the property or transaction which is the subject of the action *1004 and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties."
Second, a party can intervene as a matter of right pursuant to Rule 24(a)(1) "[u]pon timely application ... when a statute of the United States confers an unconditional right to intervene." In this case, the statutory conferral can be found in CERCLA § 113(i), which mandates intervention "when such person claims an interest relating to the subject of the action, and is so situated that the disposition of the action may, as a practical matter, impair or impede the person's ability to protect that interest, unless the President or the State shows that the person's interest is adequately represented."
The showings required by Rule 24(a)(1) and CERCLA § 113(i) are materially identical; they differ only in that CERCLA shifts the burden of proof to the government regarding adequate representation. Both require that the intervenor have an "interest" in the lawsuit. The "interest" must be "more than peripheral or insubstantial; the applicant must assert a `significantly protectable interest.'" Planned Parenthood of Minnesota, Inc. v. Citizens for Community Action, 558 F.2d 861, 869 (8th Cir.1977), citing Donaldson v. United States, 400 U.S. 517, 531, 91 S.Ct. 534, 542, 27 L.Ed.2d 580 (1971).
The Intervenors argue that their interest stems from CERCLA § 113(f). Section 113(f)(1) provides that "[a]ny person may seek contribution from any other person who is liable or potentially liable" under CERCLA § 107. The non-settling Intervenors describe their interest as a right of contribution against the settling defendants which will be impaired by the entry of the consent degree because § 113(f)(2) protects a PRP who enters into an approved settlement with the government from contribution claims regarding any matters addressed in the settlement.
A claim for contribution under CERCLA is simply not a "significantly protectable interest" in light of the structure and design of CERCLA as a whole. Congress designed CERCLA to promote early settlements by rewarding those who settle with immunity from contribution claims and by saddling those who do not settle with potentially disproportionate joint and several liability for any amounts remaining. State of Arizona v. Motorola, Inc., 139 F.R.D. 141, 145 (D.Ariz.1991), citing United States v. Cannons Engineering Corp., 899 F.2d 79, 91 (1st Cir.1990). See also United States v. ABC Indus., 153 F.R.D. 603 (W.D.Mich. 1993). Allowing non-settling PRPs to intervene would thwart the very settlements that CERCLA encourages.
In addition, the contribution claims of non-settling PRPs are too speculative and contingent. United States v. Alcan Aluminum, Inc., 25 F.3d 1174, 1184 (3rd Cir.1994). The extent of the non-settling PRPs' liability is not yet known (indeed, the Intervenors in this case hotly contest any CERCLA liability on their part). Such claims are contingent upon a finding of liability at some future proceeding not yet initiated.
While the Eighth Circuit has recognized that some contingent interests may support intervention under Rule 24(a)(2), the issue has not been addressed in the context of CERCLA. SEC v. Flight Transp. Corp., 699 F.2d 943 (8th Cir.1983); Planned Parenthood of Minnesota, Inc. v. Citizens for Community Action, 558 F.2d 861 (8th Cir.1977). Furthermore, there are limits to the sufficiency of contingent interests: "[T]he intervenor cannot rely upon an interest which is wholly remote and speculative." SEC v. Flight Transp. Corp., 699 F.2d at 948. In this case, the Intervenors' interest is contingent upon litigation which has not begun and may never be pursued, the outcome of which may or may not result in liability attributable to the Intervenors. This degree of contingency cannot justify intervention in light of the overall structure of CERCLA. To allow the intervention of non-settling PRPs for the purpose of hindering consent decrees with other parties would subvert CERCLA's encouragement of settlement agreements.
The Intervenors rely heavily on United States v. Acton Corp., 131 F.R.D. 431 (D.N.J. 1990). In Acton, the court allowed non-settling PRPs to intervene in suit between the *1005 United States and some settling PRPs in order to challenge the proposed consent decree; the intervenors had already been sued by the federal government under CERCLA. The Acton court found the language of § 113(i) to give unambiguously a right of intervention to "any person" who satisfies the section's requirements. The court explained that the contribution claim given by § 113(f)(1) is a "statutory right" sufficient for intervention. Id. at 434. The court noted that the parties should be able to intervene in order to protect that right from being extinguished by CERCLA § 113(f)(2) with the entry of the consent decree. Id. at 433-34.
Asserting that § 113(i) is unambiguous, the Acton court refused to consider not only legislative history suggesting that Congress did not intend to permit dissatisfied non-settlers to intervene in order to challenge the entry of CERCLA consent decrees, but also the structure of CERCLA as a whole. Id. at 433. The Supreme Court has explained that "[w]hen construing the `plain meaning' of a statute, a court must read the particular statutory language at issue in light of the language and design of the statute as a whole." K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988). To read § 113(f)(1) to create a protectable interest sufficient for intervention under § 113(i) for the purpose of fighting the operation of the contribution bar in § 113(f)(2) is to make knots in CERCLA's net. CERCLA is designed to cast a wide net of strict liability over many PRPs in order to facilitate the cleanup of hazardous waste sites. To that end, CERCLA encourages early settlement by rewarding settlers and burdening non-settlers. CERCLA specifically takes away contribution claims under § 113(f)(2) from non-settling parties against settling ones. In light of CERCLA's structure and goals, this Court does not believe that a claim for contribution under § 113(f)(1) can constitute a "protectable interest" for the purpose of warranting the intervention of a non-settling PRP in the consent decree of settling PRPs. Thus, Acton will not be followed here.
CERCLA provides non-settling PRPs with an opportunity to have its objections to a consent decree heard. Section 122(d)(2) mandates that a 30-day period for public notice and comment after publication in the Federal Register pursuant to EPA regulations. 42 U.S.C. § 9622(d)(2); 28 C.F.R. § 50.7. See United States v. Vasi, 1991 WL 557609, at *3-4 (N.D.Ohio 1991). At that time, non-settling PRPs can voice their objections. CERCLA also requires that the federal government give PRPs notice of settlement negotiations. 42 U.S.C. § 122(e)(1). In addition, settlement agreements under CERCLA require court approval and thus are reviewed independently by a federal court for fairness, reasonableness and consistency with CERCLA. 42 U.S.C. § 9622(d).

B. Permissive Intervention
Pursuant to Rule 24(b)(2), a court has discretion to allow a party to intervene "[u]pon timely application ... when an applicant's claim or defense and the main action have a question of law or fact in common." Permissive Intervention in this case is not warranted because the parties to this case have already agreed to the terms of the consent decree and intervention would prolong the settlement process and delay cleanup of the site. See United States v. Pitney Bowes, Inc., 25 F.3d 66, 73-74 (2d Cir.1994); United States v. Wheeling Disposal, Inc., No. 92-1320, slip. op. at 4 (W.D.Mo. Oct. 1, 1992).

III. Consent Decree
Before entering a consent decree, this Court must find that the settlement is procedurally fair, substantively fair, reasonable and consistent with CERCLA. United States v. Hercules, 961 F.2d 796, 800 (8th Cir.1992); United States v. Cannons Engineering Corp., 899 F.2d 79, 84-86 (1st Cir. 1990); Arizona v. Nucor Corp., 825 F.Supp. 1452, 1456 (D.Ariz.1992). The law favors settlements, and that policy "`has particular force where, as here, a government actor committed to the protection of the public interest has pulled the laboring oar in constructing the proposed settlement.'" United States v. Bliss, 133 F.R.D. 559, 568 (E.D.Mo. 1990), citing Cannons, 899 F.2d at 84.
*1006 The United States, including three settling federal agencies, the State of Missouri and 179 PRPs, signed the consent decree (hereinafter "Agreement") which the government now moves this Court to enter. The Agreement generally requires that, subject to oversight by the EPA, the settling PRPs (1) design and implement specific remedial action for the soil contamination and operate and maintain the MEW Site consistent with such action, (2) perform a groundwater design investigation and (3) reimburse certain future and past response costs incurred by the government. (Agreement at 13-14, 16-18, 20-25, 29-30, 52-54).
The settling defendants agreed to establish and maintain financial security in the amount of $17.6 million and a trust fund to assure completion of the work. (Id. at 42, 44). Settling defendants must pay for all costs but will be reimbursed by the government for 20% of some costs incurred in the design and construction of the remedial action, the groundwater design investigation and additional response actions conducted necessary to achieve certain performance standards. (Id. at 46). Additionally, special provisions in the Agreement apply to the cash-out payments of settling federal agencies and various de minimis settling defendants. (Id. at 85-86, 91, 101).
MEWSC developed a cost allocation formula to determine the liability of all parties to the settlement. (Id. App. K). Basically, the formula makes liability volumetrically proportional to the amount of PCB-contaminated oil contained in types of electrical equipment at the MEW Site. (Id. App. K at 2). An individual PRP's share of the liability is dependent upon that PRP's relationship to the various equipment at the Site. (Id.).
The Court further notes that the Agreement under consideration is a partial settlement. While settling defendants are required to remedy soil contamination and to investigate ground water contamination, remedial measures regarding groundwater contamination are not specifically addressed.

A. Procedural Fairness
A court must look to the negotiation process and "`attempt to gauge its candor, openness, and balancing power.'" Nucor, 825 F.Supp. at 1456, quoting Cannons, 899 F.2d at 84. The government in this case provided ample notice to all PRPs and provided opportunities for all PRPs to participate, not only in the negotiations, but also in the settlement. (Aff. Pauletta France-Isetts, dated November 13, 1992). In addition to notices and participation invitations by EPA to all PRPs, MEWSC sent a letter dated October 6, 1989, to all PRPs asking them to attend a meeting to discuss the allocation formula. Two weeks after that meeting, MEWSC mailed minutes and a letter discussing what happened at the meeting to every PRP. During March and June of 1990, all PRPs received communications from MEWSC about an additional settlement meeting held on July 10, 1990, and a copy of the proposed allocation formula. (Aff. Alphonse McMahon, dated November 16, 1992) (Defs.' Resp. in Opp'n to Mot. to Intervene Ex. 2, 3, 4, 5). Thus, EPA's negotiations with MEWSC, which were drawn out over several years, were open to all PRPs, and the PRPs were given more than adequate notice, information and opportunities to participate.
The Intervenors, however, object to the federal government's refusal to negotiate separately with them; they claim that the federal government was only interested in negotiating with one large PRP group. The government counters by stating that it met with the Intervenors numerous times and seriously considered their requests. (U.S.' Resp. in Opp'n to Mot. to Intervene Ex. 2, 3). The Intervenors further contend that MEWSC would not recognize or advocate their interests. While the impact of an agreement on non-settling parties may be used to indicate procedural fairness, what the Intervenors do not appreciate is that a failure of all parties to reach an agreement with the government is not necessarily indicative of procedural unfairness.
Furthermore, under CERCLA, EPA is "at liberty to negotiate and settle with whomever it chooses." Bliss, 133 F.R.D. at 569, citing Cannons, 899 F.2d at 93. Here, EPA did open up its settlement process to all PRPs and not only gave them an opportunity to join in the Agreement, but also invited them to participate in its negotiation. Such openness *1007 will not be penalized by this Court because it resulted in only a partial settlement.
In light of EPA and MEWSC's efforts at an open and candid dialogue among all PRPs, large and de minimis alike, this Court finds that procedural fairness existed in this case.

B. Substantive Fairness
Substantive fairness invokes "corrective justice and accountability issues: a party should bear the cost of the harm for which it is legally responsible." Cannons, 899 F.2d at 87. Settlement terms must be based on an acceptable measure of comparative fault which apportions liability according to "rational (if necessarily imprecise) estimates of how much harm each PRP has done." Id. A court is not required to determine the best method for measuring fault and apportioning liability; it must approve of the method proposed by the government unless it is "arbitrary, capricious, and devoid of a rational basis." Id. In addition, a court must give a proper degree of deference to the agency's expertise. United States v. Akzo Coatings of Am., Inc., 949 F.2d 1409, 1426 (6th Cir.1991).
In the Agreement before this Court, EPA has attempted to apportion liability based on fault in the cost allocation formula described above. EPA reviewed and recommended the allocation formula after assessing all the background data upon which it was based, including MEW records, MEWSC records, Site conditions, Site remedy, PCB regulations and industry practices. (Aff. Pauletta France-Isetts, dated March 4, 1993). Additionally, MEWSC's Allocation Committee made detailed findings, after inviting comments and input from other PRPs, justifying the appropriateness of the allocation formula. (Agreement App. K).
The Intervenors contend that the allocation formula is arbitrary and capricious because it subjects a PRP to liability for PCB-contaminated oil presumed to be in transformers sent to MEW for any reason unless that PRP can prove that the transformers were oil-free or contained oil with less than 2ppm PCBs. The Intervenors claim that this formula unfairly shifts the burden of proof regarding liability to PRPs who merely sent transformers to MEW; they assert that PRPs who sent transformers to MEW for repair or resale should not be liable under CERCLA because those PRPs had not "arranged for the disposal of a hazardous substance" under § 107(a)(3). 42 U.S.C. § 9607(a)(3).
The Intervenors' primary concern is with its own liability. However, as non-settlers, they are not bound by the allocation formula and may contest their liability in a future proceeding. While they claim that they did not participate in the settlement because the allocation was so unfair, their arguments do not persuade this Court that the allocation formula is arbitrary or capricious. The formula is a product of extensive negotiations and study. This Court cannot say that basing liability proportionally on the volume of PCB-contaminated oil contained in particular types of electrical equipment is devoid of a rational basis. Thus, this Court finds the Agreement to be substantively fair.

C. Reasonableness
This Court does not need to assess whether the government made the best possible settlement. Nucor, 825 F.Supp. at 1464 (citations omitted). Whether the Agreement is reasonable rests on several considerations: "the technical adequacy of the remedies proposed and the adequacy of the settling defendants' obligations to cover the response costs, particularly as weighed against the savings represented by settlement over litigation." Bliss, 133 F.R.D. at 568, citing Cannons, 899 F.2d at 90. The Court notes that the "underlying purpose of the court in making these inquiries is to determine whether the decree adequately protects the public interest." United States v. Seymour Recycling Corp., 554 F.Supp. 1334, 1339 (S.D.Ind.1982). Additionally, a court must not substitute its judgment for that of the parties in light of a strong public policy favoring settlements. Id. at 1338.
None of the comments filed in response to the publication of the Agreement challenge the efficacy of the remedial action selected for the MEW Site. Under the Agreement, the settling defendants will treat the soil contamination with onsite incineration. (Agreement App. B at 2); (ROD at 29, 37). *1008 Additionally, they will conduct a groundwater design investigation to define the requirements for any groundwater remedial action. (Agreement App. B at 19). The settling defendants will cover a majority of the costs associated with these activities and will post a bond to assure completion of the work as described above. Furthermore, with the entry of the consent decree, remedial action can begin immediately. Denial of the decree would result in protracted negotiations and litigation, as well as delay in cleaning up the Site.
Having reviewed the record of decision in this case, the Agreement, and other documents filed, the Court is satisfied that the Agreement is a reasonable partial settlement and serves the public interest.

D. Consistency with CERCLA
Finally, the Agreement must be consistent with CERCLA's "overarching principles: accountability, the desirability of an unsullied environment, and promptness of response activities." Cannons, 899 F.2d at 90. CERCLA is designed to favor settlements over litigation. Id. at 92.
The Agreement forces many of those responsible for the environmental contamination at the MEW Site to pay for their acts in a fair and reasonable way. Entry of the consent decree in this case will promote settlement and expedite remedial action at the Site. The partial cleanup of a Superfund Site is clearly in the public interest. The Court finds that the consent decree in this case is not only consistent with CERCLA's objectives but also is procedurally fair, substantively fair and reasonable. Accordingly,
IT IS HEREBY ORDERED that the motion to intervene is denied with prejudice.
IT IS FURTHER ORDERED that the motion to deny entry of consent decree is denied as moot.
IT IS FURTHER ORDERED that plaintiff's motion to strike the motion to deny entry of consent decree is denied as moot.
IT IS FURTHER ORDERED that plaintiff's motion to enter consent decree is granted.
IT IS FURTHER ORDERED that all other motions pending before this Court in this case are denied with prejudice as moot.
NOTES
[1] The service shop owners' trade association, Electrical Apparatus and Service Association, is also moving to intervene.