UNITED STATES of America, Plaintiff,

v.

BAY AREA BATTERY,
et al., Defendants.

Civ. A. No. 94–50390–LAC.

United States District Court,
N.D. Florida,
Panama City Division.

Aug. 18, 1995.

Samuel Alter, Assistant U.S. Attorney, Pensacola, FL, Leslie Allen, Senior Attorney, Environmental Enforcement Section, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, for plaintiff.

Philip Bates, Clark, Partington, Hart, Pensacola, FL, Robert Steinwurtzel, Thomas R. Lotterman, Bonnie S. Kartzman, Swidler & Berlin, Washington, DC, for defendants.

## ORDER GRANTING ENTRY OF CONSENT DECREE

COLLIER, District Judge.

Pending is the Government's motion for entry of a consent decree in this action brought under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA). The Government negotiated the decree with 11 companies and individuals identified as potentially responsible parties (PRP's) under CERCLA for the contamination at the Sapp Battery Superfund Site (the Site). Intervenor Jackson Iron & Metal Co. opposes the decree. After reviewing the briefs and evidence, the Court grants the Government's motion.

## I

### Factual Background

In December 1990 and May 1991, the EPA sent letters to approximately 225 companies and individuals identifying them as PRP's for the Site and demanding payment for past response costs. A number of these PRP's banded together to form the Sapp Battery Superfund Site Group (the Group). Throughout 1991, the Environmental Protection Agency (EPA), Department of Justice (DOJ) and the Group attempted to negotiate a consent decree resolving the Group's liability for the Site's cleanup. When negotiations dragged on into 1992, however, the EPA issued Unilateral Administrative Orders under section 106 of CERCLA. These orders required the Group and other PRP's to com-

mence cleaning up the Site by February 1992 or face significant fines. In April 1992, the Group and the Government signed a consent decree which the Court entered in *United States v. Aaron Scrap Metals, Inc.,* case no. 92–50244–LAC (N.D.Fla. March 10, 1993) [hereinafter the "the *Aaron Scrap* decree"].

Under the *Aaron Scrap* decree, the Group is obligated to pay the Government $1 million to partially reimburse the Government for past response costs. The Group further agreed to clean up the soil at the Site at an estimated cost of $15 million. While the *Aaron Scrap* decree settled the Group's liability for the soil cleanup, it left unresolved the Group's liability for cleaning up the groundwater and natural resource damage. The Group remains liable to the Government and/or private parties for costs in these areas.

While negotiating the *Aaron Scrap* decree, the Group apparently sought an agreement completely resolving its members' liability for the Site's cleanup. The Group also sought broad protection from contribution claims by other PRP's under section 113(f)(2) of CERCLA. The Government refused both requests, and instead limited the terms of the *Aaron Scrap* decree to the soil cleanup. The Government further indicated it would pursue non-settling, "recalcitrant" PRP's for the remainder of the Government's nearly $3 million in past costs.

Since signing the *Aaron Scrap* decree, the Group has filed two CERCLA actions against groups of non-settling PRPs. *See Chatham Steel v. Sapp,* case no. 93–50064 (N.D.Fla., filed March 9, 1993) [hereinafter *Sapp* ]; *Chatham Steel v. Airline Auto Salvage,* case no. 94–50383 (N.D.Fla., filed Dec. 12, 1994) [hereinafter *Airline Auto* ]. In these suits, the Group seeks to recoup costs it has incurred pursuant to the *Aaron Scrap* decree.[1] Ten of the defendants in *Sapp* and *Airline Auto* are signatories of the decree in the instant case.[2]

---

1. In *Sapp,* the Court has granted summary judgment on the issue of the defendants' liability under CERCLA for the costs of cleaning up the Site. *See Chatham Steel v. Sapp,* 858 F.Supp.

1130 (N.D.Fla.1994). A motion on damages is currently pending in that case.

2. The *Sapp* defendants are: 1) Blattner Metals, Inc.; 2) Robert Anderson/Anderson Battery; 3)

In early June 1993, the Government began its efforts to collect the remainder of its past costs. The EPA sent out demand letters to the viable, non-*de minimis* PRP's who had not settled with the Government. The EPA demanded over $2.6 million in past response costs from these PRPs. Seven PRPs responded stating that while they could not pay the full amount, they wanted to cooperate with the Government. The EPA and these PRPs began negotiating the consent decree before the Court today.

Since the Government and the Group were pursuing the same parties for payment, the Government, the Group and the PRPs attempted to negotiate a three-way settlement. These negotiations broke down, however, over differences between the Government and the Group regarding how much the PRPs should pay and how to divide the payments between the Government and the Group. The Government proceeded to negotiate the consent decree without the Group's further participation.

The result is an "ability to pay" decree (the Decree) between the Government and 11 businesses and individuals. By all accounts, the PRPs signing the Decree do not have the financial resources to pay their "full" shares of the Site's cleanup cost. Several of the businesses have operated at a loss in recent years. The individuals involved range in income from impoverished to middle class. In negotiating the Decree, the Government required the PRPs to individually document their financial condition through tax returns, balance sheets and sworn affidavits.

The Government used this information to calculate payment amounts for each settling PRP. For the companies involved, the Government claims these figures represent the most each company can pay and still stay in business. As for the individual settlors, the Government asserts their payments allow them to compensate the Government without selling off significant assets or filing for personal bankruptcy.

In exchange for these payments, the Government is granting each settlor a complete release from liability under CERCLA for the Site's cleanup. In other words, the settlors are being allowed to "cash out." With certain reservations and reopeners, the Government covenants not to sue the settlors under sections 106 and 107 of CERCLA. The Government further grants the settlors contribution protection under Section XII.B of the Decree:

> With regard to claims for contribution against Settling Defendants for matters addressed in this Consent Decree, the Parties hereto agree that the Settling Defendants are entitled to such protection from contribution actions or claims as is provided by CERCLA Section 113(f)(2), 42 U.S.C. § 9613(f)(2). For the purposes of this Section, and except as provided in Paragraphs X.B–E [reservation of rights], matters addressed in this Consent Decree shall be Settling Defendants' liability pursuant to Sections 106 or 107(a) of CERCLA for implementation of response actions at the Site, including liability for Response Costs incurred by the United States or response costs incurred and to be incurred by any other person with respect to the Site.

This last provision lies at the heart of the Group's opposition to the Decree. As discussed below, the Decree's contribution protection insulates the settlors from damages in the *Sapp* and *Airline Auto* actions.

Though the Group is not part of the settlement, the Decree contains several provisions in its favor. For one, the Group will receive 20 percent of the settlement amount, with the Government keeping 80 percent. The Decree also requires the settling PRPs assist the Group in locating other PRPs. Finally, the Decree requires the settlors assign to the Group any rights they have under insurance policies covering their CERCLA liability.

The Government lodged the Decree with the Court on December 27, 1994. As required by law, notice of the proposed Decree was published in the Federal Register on January 5, 1995. *See* 60 Fed.Reg. 1801 (Jan.

Dueitt Battery Co./Buddy Ray Dueitt; 4) Goulding Scrap Material, Inc.; 5) Main Metal Co.; 6) Lampp Battery Sales, Inc.; and 7) Dan Lampp Battery Co. In *Airline Auto*, the defendants are Robert A. Miller/West Florida Battery, Arthur Kurtz and Eugene T. Fuller/Bay Area Battery Co.

5, 1995). The 30–day public comment period expired on February 6, 1995.

During the comment period, the Government received one set of comments from the Group. In its comments, the Group strongly objected to the Decree. Jackson Iron & Metal Co., intervening in this action on behalf of the Group, has also filed a brief opposing the Decree. Since lodging the Decree with the Court, the Government and the settling PRPs have agreed to certain minor modifications of the Decree. The Government therefore moves for entry of the Decree, as modified.

## II

### *Discussion*

The Group raises several objections to the Decree. The Group complains the Decree treats them unfairly because the settlors are getting a better deal than the Group received in *Aaron Scrap.* For example, the settlors in the instant case are being permitted to cash out, while the Group was not. At the same time, the Group complains the settlors are not paying their "fair share" of the costs. In particular, the Group challenges the Government's calculations of what several settlors could pay towards the cleanup. The Group also believes it should get more than 20 percent of any recovery. Perhaps the Group's most significant complaint, however, is the Government foreclosing the Group from recovering damages from the settlors who are also defendants in the *Sapp* and *Airline Auto* actions.

■ In reviewing a proposed consent decree, a court's function is " 'satisfy itself that the settlement is reasonable, fair, and consistent with the purposes that CERCLA is intended to serve.' " *United States v. Cannons Engineering Corp.,* 899 F.2d 79, 85 (1st Cir.1990) (quoting H.R.Rep. No. 253, Pt. 3, 99th Cong., 1st Sess. 19 (1985) *reprinted in* 1986 U.S.Code Cong. & Admin.News 3038, 3042). Though the decision to approve or reject a consent decree is left to a district court's discretion, *see United States v. Hooker Chemical & Plastics Corp.,* 776 F.2d 410, 411 (2d Cir.1985), the court must exercise its judgment deferentially.

■ It is not the Court's place to determine whether the decree represents an optimal settlement in the Court's view. *United States v. Cannons Engineering Corp.,* 720 F.Supp. 1027, 1036 (D.Mass.1989), *aff'd,* 899 F.2d 79 (1st Cir.1990). "Where a court is reviewing a consent decree to which the government is a party, the balancing of competing interests affected by a proposed consent decree 'must be left, in the first instance, to the discretion of the Attorney General.' " *Kelley v. Thomas Solvent Co.,* 717 F.Supp. 507, 515–16 (W.D.Mich.1989) (quoting *United States v. Bechtel Corp.,* 648 F.2d 660, 666 (9th Cir.), *cert. denied,* 454 U.S. 1083, 102 S.Ct. 638, 70 L.Ed.2d 617 (1981)). When, as in this case, an agency committed to furthering the public interest has negotiated a decree, there is a presumption of validity. *Kelley v. Thomas Solvent Co.,* 790 F.Supp. 731, 735 (W.D.Mich.1991); *New York v. Exxon Corp.,* 697 F.Supp. 677, 692 (S.D.N.Y.1988); *United States v. Rohm & Haas Co.,* 721 F.Supp. 666, 681 (D.N.J.1989). With these tenets in mind, the Court must determine whether the proposed decree satisfies the requirements of being reasonable, fair and consistent with CERCLA's goals. *Cannons Engineering,* 899 F.2d at 85; *United States v. Akzo Coatings of America, Inc.,* 949 F.2d 1409, 1424 (6th Cir.1991); *United States v. Montrose Chemical Corp.,* 50 F.3d 741, 746 (9th Cir.1995).

### *Fairness*

■ When reviewing a CERCLA settlement, fairness has two components: procedural fairness and substantive fairness. *Cannons Engineering,* 899 F.2d at 86. In assessing procedural fairness, courts should review the bargaining process and measure its candor, openness, and the bargaining balance between the parties. *Id.*

■ There is no indication the negotiation of the Decree was procedurally unfair. From the start, the Government attempted to work with the Group and the PRPs to complete a three-way settlement. The Government and the Group freely exchanged financial information from the PRPs, and both had the opportunity to evaluate the

PRPs' ability to pay. Unfortunately, a three-way arrangement failed due to an honest dispute over the size and distribution of the settlement payments. The Group cannot complain the Government did not attempt to accommodate the Group's interests.

As to the deals the Government struck with the settling PRPs, the Court finds nothing procedurally amiss here either. While several of the PRPs were not represented by counsel or had neglected to pay their attorneys' fees, the Government did not take advantage of any settlor's *pro se* status. Rather, the Government bargained at arms length and in good faith with the PRPs. Furthermore, the Government made reasonable efforts to collect and analyze financial data before agreeing to specific payment terms.[3] Simply put, the negotiations leading up to the Decree were procedurally fair.

■ As for substantive fairness, the Group raises several objections. Initially, the Group complains the Government awarded the settlors in the instant case a better deal than the Group received in *Aaron Scrap*. The Group further objects to the settlement amounts for three PRPs: Goulding Scrap, Lampp Battery Sales and Arthur Kurtz. The Group contends these defendants could pay significantly more than the Government's price for settlement. Finally, the Group challenges the Government's authority to impose an 80/20 split of the recovery on the Group.

The Court is not swayed by these arguments. The settlement here may be more advantageous for the settling PRPs than was the case in *Aaron Scrap*, but this is due to significant differences between the two groups of PRPs signing the decrees. The Group, whose members signed the *Aaron Scrap* decree, contains several large, profitable corporations. These corporations shipped significant amounts of batteries to the Site, and have the wherewithal to finance and conduct the soil cleanup. Given the Group members' liability and financial resources, the Government naturally demanded more in the *Aaron Scrap* decree.

In contrast, the settlors in the instant case are individuals and small "mom-and-pop" businesses. Most of these businesses have operated at a loss in recent years and are struggling to survive. As for the individual settlors, no one could be deemed "wealthy" by any definition of that term. At best, a couple persons could be considered "middle class." The others, however, are either elderly and/or poor. As a group, these PRPs have little to contribute towards cleaning up the Site.

Generally, settlements in CERCLA cases should be based upon "some acceptable measure of comparative fault, apportioning liability among the settling parties according to rational (if necessarily imprecise) estimates of how much harm each PRP has done." *Cannons Engineering*, 899 F.2d at 87. The Government, however, must be afforded leeway to depart from an apportionment formula to account for factors not amenable to regimented treatment. *Id.* at 88. One such factor is a PRP's financial health. While certain PRPs have deep pockets and can afford to shoulder their full share of liability for a site's cleanup, other PRPs simply do not have the resources to pay their share.

Here, the Government has entered into what it calls an "ability to pay" decree. When negotiating with PRPs who are small businesses or individuals of modest means, the Government seeks to avoid settlements that will force the businesses and individuals into bankruptcy or require them to sell off major assets. Instead, the Government requires such PRPs to pay an amount that will allow businesses to continue operating and will not jeopardize the modest lifestyles of individual parties. In this fashion, the Gov-

---

3. Mr. Philip Bates, the Group's attorney who reviewed the settlors' financial information, states the information obtained from the settling PRPs is insufficient to judge their "ability to pay." (Exh. 3 to Brief in Opp. to Pl.'s Mot. for Entry of Consent Decree at 11). While the Government could have delved further into the PRPs' financial situations, this was unnecessary. Further inquiry would not have yielded information relevant to determining a PRP's "ability to pay." The investigation suggested by Mr. Bates may be proper in a bankruptcy case or a "workout"—areas of Mr. Bates' expertise—but it is overkill in the context of negotiating a CERCLA consent decree.

ernment will recover some of its past costs while the PRPs are spared financial ruin.

This policy is fair under the circumstances of this case. The Government could have squeezed the settlors for more money, but this would likely have rendered some or all of the settlors destitute. While such an approach would have netted the Government more funds, the additional recovery may have been marginal compared to the amount of the Government's past costs and the estimated cost of the soil cleanup. Under the circumstances, the Government reasonably gave up a small increase in recovery to allow the settlors to stay afloat financially. Such a tradeoff recognizes the value of permitting a functioning business to continue to earn money and employ workers. It also shows compassion for individuals who are aged and/or impoverished.[4]

Given the policy behind an "ability to pay" decree, it is reasonable the Government allowed the settlors here to "cash out" and granted them broad contribution protection. Since the premise of such a settlement is the settling PRPs are being asked to pay all they can afford, it makes sense to assume they cannot contribute more in the future. Furthermore, the settlors' modest financial positions make it reasonable for them to demand—and the Government to grant—complete contribution protection. Without such protection, the PRPs' incentive to settle with the Government diminishes as they face being driven into the ground by contribution actions regardless of whether they settle with the Government.

The Government did not have to accommodate such concerns when it negotiated the *Aaron Scrap* decree. As noted above, the Group contains several large companies with the financial resources to undertake cleaning up the Site. Since CERCLA permits the Government to hold PRPs jointly and severally liable for cleanup costs, *see, e.g., O'Neil v. Picillo,* 883 F.2d 176, 178 (1st Cir.1989), *cert. denied sub nom., American Cyanamid Co. v. O'Neil,* 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990); *United States v. Aceto Agric. Chem. Corp.,* 872 F.2d 1373, 1377–78 (8th Cir.1989), it was not unreasonable for the Government to exact such a settlement from the Group. Furthermore, the Group's need for broad contribution protection is not comparable to that of the settlors in this case. Because the Group agreed to conduct the soil cleanup—by far the most expensive remedial action at the Site—it is unlikely other PRPs will sue the Group to recoup costs.[5] Rather, as the *Sapp* and *Airline Auto* actions demonstrate, the Group is the party seeking contribution from other PRPs.

■ Since the Group's members did not have "ability to pay" problems, the Government did not follow this policy in negotiating the *Aaron Scrap* decree. Given the different financial postures of the Group's members and the settlors in the instant case, it was reasonable for the Government to negotiate different deals in the two decrees. It is not necessarily unfair for the Government to negotiate different kinds of settlements in ac-

4. Another group of interested parties are creditors of the individuals and companies signing the Decree. By allowing the settlors to continue their businesses and avoid bankruptcy, an "ability to pay" decree increases the likelihood the settlors will be able to maintain and pay off their other debts. In this sense, the Decree in the instant case respects the interests of the settlors' creditors. While the interests of private creditors should not weigh heavily in the Government's negotiating strategy, a decree that accommodates such interests is fairer than one that does not do so.

5. Indeed, the Group's complaint the settlors in the instant case can turn around and sue the Group for contribution is spurious. While the limited contribution protection afforded in the *Aaron Scrap* decree may permit such a suit, it is

unlikely to ever occur. Under section 113(f)(1) of CERCLA, courts should apportion damages in contribution suits according to equitable factors such as the extent to which various PRPs contributed to a site's contamination and whether or not a PRP has settled with the Government. *See United States v. R.W. Meyer, Inc.,* 932 F.2d 568, 571–74 (6th Cir.1991). If, as the Group claims, the settlors in the instant case are not being asked to pay their "fair share," then they have no contribution claims because they have not had to bear more than their equitable share of the costs. Furthermore, the fact the Group has undertaken the bulk of the cleanup work at the Site would be respected by a court and make it less likely the Group would have to contribute more to the cleanup than it has already agreed to in the *Aaron Scrap* decree.

tions arising out of a single CERCLA site. *Cf., Cannons Engineering,* 720 F.Supp. at 1041–44 (finding it fair to charge two groups of PRPs different premiums for settlement); *United States v. Seymour Recycling Corp.,* 554 F.Supp. 1334, 1338–39 (S.D.Ind.1982) (approving the Government's negotiating a larger settlement amount in a second "cash out" decree after negotiating a decree requiring certain PRPs to conduct a surface cleanup of site).[6]

■ Aside from assailing what it views as the generally lenient terms of the Decree, the Group challenges the settlement amounts for Goulding, Lampp Battery and Arthur Kurtz. In the Group's view, the Government accepted significantly less than what these PRPs could pay.

The Court has carefully reviewed the statements of the opposing financial experts, and concludes the Government's settlement amounts for Goulding, Lampp Battery and Arthur Kurtz are fair and reasonable. The Group argues all three PRPs could have paid larger settlements if the Government had permitted them to pay over a longer period of time. The Decree calls for the settlors to either pay off their debt immediately upon entry of the Decree or within one or two years thereafter. If the Government had given the settlors ten years to pay off their debts, the Group calculates they could have paid significantly more than the Government agreed to take.

The Government, however, has a reasoned explanation for insisting on the relatively short payment periods in the Decree. For one, the Government objects to the added administrative burden of collecting debts over a long period of time. Meanwhile, by insisting on a shorter payment period, the Government reduces the risk a settlor will declare bankruptcy while a portion of its debt is outstanding. Given the precarious financial positions of Goulding, Lampp Battery and Kurtz, this is a legitimate concern on the Government's part.

The Group's reasoning is further flawed by its focus on the market value of the PRPs' assets. The value of a PRP's assets is only relevant if the Government contemplates forcing the PRP to sell off property to pay the settlement. As explained above, however, the policy behind an "ability to pay" settlement is the settlors should pay what they can afford to pay without going out of business or into personal bankruptcy. Since this policy seeks to avoid forcing PRPs to sell off key assets to meet their obligations, the value of their assets has little relevance in the calculation of settlement amounts.

The Group's objections to the settlement amounts for these three PRPs demonstrate one settlement figure can rarely, if ever, be designated as "fair" to the exclusion of others. Instead, what is a "fair" settlement of a given PRP's liability depends on a balancing of factors such as the PRP's contribution to a site's contamination, the financial condition of the PRP and the timing of the settlement. Reasonable people can weigh these and other factors differently to arrive at divergent amounts. So long as the Government's figure falls within a range of reasonable amounts, a court should not be inclined to second-guess the Government's calculations. *Cf., Rohm & Haas,* 721 F.Supp. at 685–86 ("Compromise of litigation occurs precisely because there is uncertainty about the underlying factual circumstances and the range of possible recoveries. If a settlement is reasonable in light of those circumstances, it ought to be approved."). Here, the amounts

---

6. The Group contends the more lenient terms of the decree in this case contravene certain promises the Government made to the Group during the negotiation of the *Aaron Scrap* decree. If the Group is making a veiled estoppel argument, they have failed to meet the difficult standard of proving estoppel against the United States as demonstrated in *Heckler v. Community Health Servs.,* 467 U.S. 51, 60–61, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984) and *Immigration and Naturalization Service v. Miranda,* 459 U.S. 14, 19, 103 S.Ct. 281, 283–84, 74 L.Ed.2d 12 (1982).

If the Group points to these alleged promises as evidence the Government treated them unfairly, the Court is unimpressed. The only evidence of these promises is the unsupported statement of the Group's counsel. By itself, this evidence does not establish any promises were made. Assuming the Government ever would or could make such assurances, the Group should have memorialized them either in the *Aaron Scrap* decree or in some other document if it intended to rely on them.

the Government demands of Kurtz, Goulding Scrap and Lampp Battery appear reasonable and fair under the circumstances.

■ The Group's final, and perhaps most urgent, complaint concerns the Decree's effect on the Group's ability to recover the costs it incurs pursuant to the *Aaron Scrap* decree. The decree in the instant case calls for the Group to receive 20 percent of the total settlement. The Group complains it deserves a larger share of the recovery in light of the financial burden it has undertaken in cleaning up the soil at the Site. Perhaps recognizing the Decree will make it impossible for the Group to recover damages from the settling PRPs in *Sapp* and *Airline Auto,* the Group charges it is unfair for the Government to force an 80/20 split on the Group.

Unfortunately for the Group, CERCLA permits the Government to impose such settlements in cases like this. In 1986, Congress amended CERCLA to recognize the Government's authority to enter into a settlement with PRPs, *see* 42 U.S.C. § 9622, and clarify the settlement's effect on pending or future litigation, *see* 42 U.S.C. § 9613(f). More precisely, CERCLA provides that if the Government has "obtained less than complete relief from a person who has resolved its liability to the [Government]," the Government may bring an action against any non-settling party. 42 U.S.C. § 9613(f)(3)(A). Here, the Government obtained less than complete relief in *Aaron Scrap:* the Government recovered only $1 million of approximately $3 million in past costs, and still faced remedying groundwater contamination and natural resource loss at the Site.

Aside from being authorized by CERCLA's text, the present suit and settlement were foreshadowed in the *Aaron Scrap* decree. Paragraph V.7.a of the *Aaron Scrap* decree states:

It is the policy of the United States to identify potentially responsible parties who fail or refuse to participate voluntarily in CERCLA settlements and, subject to its non-reviewable discretion, to seek reimbursement of response costs not recovered by settlement. . . .

In reaching a settlement with the PRPs in the instant case, the Government was following a policy clearly articulated in the *Aaron Scrap* decree and approved by Congress.

Congress has also specified who—as between the Group and the Government—has a priority claim on the settlors' funds. When, as in this case, the Government and private parties are pursuing the same PRPs for reimbursement, "the rights of any person who has resolved its liability to the United States . . . shall be subordinate to the rights of the United States. . . ." 42 U.S.C. § 9613(f)(3)(C). Thus, CERCLA gives the Government's claim clear statutory priority over the Group's claim on these settlors' funds.

Indeed, CERCLA permits the Government to extinguish the Group's claim altogether. Section 113(f)(2) of CERCLA provides:

A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement.

42 U.S.C. § 9613(f)(2). As noted earlier, the Decree specifically defines "matters addressed" to include:

Settling Defendants' liability pursuant to Sections 106 or 107(a) of CERCLA for implementation of response actions at the Site, including liability for Response Costs incurred by the United States or response costs incurred and to be incurred by any other person with respect to the Site.

Since the Group's suits in *Sapp* and *Airline Auto* seek recovery of "response costs incurred and to be incurred" by the Group, the settlement in the instant case will bar recovery against the settlors in the Group's private recovery actions.

The Group takes issue with this view of how CERCLA treats its claims against other PRPs. The Group attempts to dodge section 113(f)'s provisions by arguing its claims in *Sapp* and *Airline Auto* are not contribution actions under section 113(f)(1), but cost recovery actions brought under section 107(a). Since the subordination clause of section 113 is limited to contribution actions, the Group

argues the Government does not have priority in recovering costs from the settling PRPs in this case. In the Group's view, it has equal right to recover from these PRPs, and therefore the proposed 80/20 split of the settlement is unfair.

The Group's argument, however, is premised on the mistaken view *Sapp* and *Airline Auto* are not contribution actions subject to section 113. To the contrary, the Group's suits to recover their response costs are contribution actions between PRPs. The Group's claims in *Sapp* and *Airline Auto* are therefore subordinate to the Government's right of recovery.

The Group's members, together with the defendants in *Sapp, Airline Auto* and the instant case, were identified by the EPA as PRPs for the Site. Rather than contesting their liability, the Group's members signed the *Aaron Scrap* decree. This decree obligates the Group to clean up the soil at the Site, and has forced the Group to incur the costs it now seeks to collect from other PRPs.

Because the Group's claims in *Sapp* and *Airline Auto* seek to reapportion costs between liable parties, they are not cost recovery actions under section 107(a). Instead, they are "quintessential claims for contribution." *United States v. Colorado & Eastern R. Co.*, 50 F.3d 1530, 1536 (10th Cir.1995) (citing Restatement (Second) of Torts § 886A (1979)); *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 672 (5th Cir.1989). As such, the Group's claims are properly asserted under section 113(f)(1) of CERCLA:

> Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title [§ 107(a) of CERCLA], during or following any civil action under section 9606 of this title or under section 9607(a) of this title....

42 U.S.C. § 9613(f)(1). While the Group may label their suits cost recovery actions under section 107, they are in fact suits for contri-

bution and therefore governed by section 113(f) of CERCLA. *Akzo Coatings, Inc. v. Aigner Corp.*, 30 F.3d 761, 764 (7th Cir.1994); *Colorado & Eastern R. Co.*, 50 F.3d at 1536; *United Technologies v. Browning–Ferris Industries*, 33 F.3d 96, 98–101 (1st Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1176, 130 L.Ed.2d 1128 (1995).

The cases the Group cites supporting its definition of the *Sapp* and *Airline Auto* actions are unconvincing. The courts in *Companies for Fair Allocation v. Axil Corp.*, 853 F.Supp. 575 (D.Conn.1994); *Barton Solvents, Inc. v. Southwest Petro–Chem, Inc.*, 1993 WL 382047 (D.Kan.1993); *Chesapeake & Potomac Tel. v. Peck Iron & Metal*, 814 F.Supp. 1269 (E.D.Va.1992) and *Kelley v. Thomas Solvent Co.*, 790 F.Supp. 710 (W.D.Mich. 1990) focused on the "any other person" language of section 107(a)(4)(B) in reasoning PRPs could bring suit against other PRPs under section 107(a) unaffected by section 113(f). While a PRP qualifies as "any other person" under section 107(a)(4)(B), when it sues another PRP it is still seeking to apportion liability between two culpable parties. The suit is therefore an action for contribution governed by section 113(f). The cases cited by the Group do not recognize this basic point.[7]

On its face, the language of section 107(a)(4)(B) allows PRPs such as the Group's members to bring suit under that section to recover response costs. *See* 42 U.S.C. § 9607(a)(4)(B). Section 107 cannot, however, be read in isolation. In addition to expressly authorizing contribution actions under CERCLA, section 113(f) mandates "[s]uch claims shall be brought in accordance with this section...." 42 U.S.C. § 9613(f)(1). Thus, if a claim is for "contribution," it is subject to section 113(f)—including the subordination and contribution protection provisions. *See* 42 U.S.C. § 9613(f)(2), (f)(3)(C). In this fashion, section 113(f) qualifies the broad cause of action created in section 107(a).

---

7. To the extent that *Amcast Industrial Corp. v. Detrex Corp.*, 2 F.3d 746 (7th Cir.1993) can be read as supporting the Group's position, its authority is dubious in light of the Seventh Circuit's subsequent decision in *Akzo Coatings.* Likewise, it is doubtful the court of appeals would approve the district court's reasoning in *United States v. SCA Services of Indiana, Inc.*, 849 F.Supp. 1264 (N.D.Ind.1994) given the reasoning of *Akzo Coatings.*

Taken to its logical extreme, the reasoning of the Group and the decisions upon which it relies would render section 113(f) a dead letter. Since any PRP qualifies as a "person" within the meaning of CERCLA, a PRP could always avoid section 113(f)'s provisions merely by styling its suit a "cost recovery action" under section 107(a). Following the lead of the First Circuit, the Court "refuse[s] to follow a course that ineluctably produces judicial nullification of an entire [CERCLA] subsection." *United Technologies*, 33 F.3d at 101. Since the Group's claims against the settling defendants in *Sapp* and *Airline Auto* are for contribution, they are subordinate to the Government's claim under section 113(f)(3)(C) of CERCLA. The statute therefore permits the Government to exclude the Group entirely from any recovery in this case. Under the circumstances, the Government is being more than fair in allocating the Group 20 percent of the settlement in this case.

In sum, the Court finds the proposed consent decree is fair in light of the settlors' limited financial means and the statutory priority CERCLA assigns to the Government's claims. The settling PRPs have limited financial resources, thus an "ability to pay" decree is proper here. While it is possible the Government may have demanded more from the settlors, the settlement amounts are reasonable. Of course, any agreement that cuts off the Group's right to recover from these PRPs is unfair from their perspective. Unfortunately for the Group, CERCLA "is not a legislative scheme which places a high priority on fairness to generators of hazardous waste." *Rohm & Haas*, 721 F.Supp. at 686.

### Reasonableness

■ The second factor for the Court to consider is the reasonableness of the Decree. *Cannons Engineering*, 899 F.2d at 89. In *Cannons Engineering*, the First Circuit described three elements of reasonableness in regards to CERCLA settlements. First and foremost, a court must assess "the decree's likely efficaciousness as a vehicle for cleansing the environment...." *Id.* Another point to consider is whether the settlement adequately compensates the public for the costs of response and remediation. *Id.* at 90. Finally, a court should measure reasonableness in light of the parties' litigating positions. The stronger the Government's case, the more it should demand of the settling parties. Yet, in some circumstances, the outcome of litigation might be uncertain or the prospect for recovery may be poor. A reasonable settlement will reflect such factors. *Id.*

■ With these thoughts in mind, the Court finds the Decree in this case is reasonable. While the settlors are not required to conduct any cleanup activities at the Sapp Battery Site, the Government is recovering money to compensate its past costs. These funds will further the cleanup at the Site and help replenish the Superfund. In this fashion, the settlement assists the Government in cleaning up the environment here and elsewhere.

Meanwhile, the Government obtained the best deal it could get under the circumstances. Proof of the settlors' liability under CERCLA may be strong, but the Government's prospect of recovery after litigation is uncertain here. Again, the limited financial resources of these PRPs must be emphasized. Though the Government could likely obtain a judgment against these parties, the costs of litigating and levying against the parties would likely outstrip the ultimate recovery. By settling with these PRPs now, the Government insures what little money the settlors have to contribute will be used to clean up the environment rather than pay attorneys.

In challenging the reasonableness of the Decree, the Group asserts two arguments discussed earlier. First, it re-iterates its objection to the settlement amounts for Kurtz, Goulding Scrap and Lampp Battery. Second, it claims the 80/20 split of the proceeds is inequitable. Since the merits of these arguments have already been addressed, there is no reason to ponder them further at this point. In short, the Court finds the proposed decree reasonable.

### Consistency with CERCLA's Goals

■ The final question for the Court to consider is whether the Decree furthers CERCLA's goals. On this issue, courts have identified two major policies underlying the statute. First, Congress intended to give the Government the tools to respond promptly and effectively to the problems posed by contaminated hazardous waste sites. Second, Congress sought to insure those responsible for the problems resulting from the disposal of hazardous substances bear the costs of remedying the harm they caused. *Anspec Co. v. Johnson Controls, Inc.*, 922 F.2d 1240, 1241–42 (6th Cir.1991); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1081 (1st Cir.1986) (quoting *United States v. Reilly Tar & Chemical Corp.*, 546 F.Supp. 1100, 1112 (D.Minn.1982)). The court in *Cannons Engineering* succinctly stated how settlements should fit within these goals:

> It is crystal clear that the broad settlement authority conferred upon the EPA must be exercised with deference to the statute's overarching principles: accountability, the desirability of an unsullied environment, and promptness of response activities.

*Cannons Engineering*, 899 F.2d at 91.

■ The proposed settlement in this case furthers these goals. Though the Group argues to the contrary, the Government is holding the settlors accountable for their contribution to the contamination at the Site. The Government did not casually enter into the "ability to pay" decree before the Court. The Government required the settlors to individually document their financial positions. After carefully analyzing this information, the Government arrived at payment figures that in its estimation were the largest it could demand from these parties. Contrary to the Group's belief, the settlors are not getting a "good deal." Rather, the Government is extracting what it can from them.

To a certain extent, the Group's opposition to the Decree reflects an opposition to "ability to pay" decrees in general. There is no question, however, CERCLA authorizes such decrees. CERCLA lists a PRP's "ability to pay" as a factor for the Government to consider in allocating responsibility among PRPs, 42 U.S.C. § 9622(e)(3)(A), and fashioning covenants not to sue, 42 U.S.C. § 9622(f)(6). Furthermore, courts have approved such decrees despite the settlement representing a fraction of the total response costs for a site. *See, e.g., United States v. Vertac Chemical Corp.*, 756 F.Supp. 1215 (E.D.Ark.1991) (approving "cash out" decree with non-*de minimis* PRP after finding the settlement amount represents "a recovery of the maximum possible amount of money obtainable from the [PRPs]. . . ."), *aff'd sub nom., United States v. Hercules, Inc.*, 961 F.2d 796 (8th Cir.1992).

In the end, the driving force behind the Group's opposition to the Decree is the Decree's effect on the Group's actions in *Sapp* and *Airline Auto*. As explained above, the Decree will extinguish the Group's claims against the settling PRPs in those cases. By cutting off their contribution rights, the Group claims the Decree rewards recalcitrant PRP's at the expense of others who came forward early in the process to resolve their liability. The Group concludes such a result is contrary to CERCLA's scheme.

If Congress intended to prevent such an outcome, it did a poor job of drafting the 1986 amendments to CERCLA. As discussed earlier, the amendments to section 113 plainly allow the Government to collect its response costs to the detriment of private parties seeking to collect from the same PRPs. Indeed, CERCLA allows the Government to go a step further and insulate a settling PRP partially or completely from claims of other PRPs. 42 U.S.C. § 9613(f)(2). Given these statutory provisions, it cannot be said the result of the Government's settlement in this case is contrary to CERCLA's scheme. *United States v. Browning–Ferris Industries Chemical Serv. Inc.*, 1990 WL 112247, 1990 U.S.Dist. LEXIS 3556, *5 (M.D.La.1990).

### III

### Conclusion

After reviewing the briefs and evidence in support thereof, the Court concludes the proposed decree is "reasonable, fair, and consistent with the purposes that CERCLA is in-

tended to serve." *Cannons Engineering,* 899 F.2d at 85. The Government's motion for entry of the consent decree (doc. 19) is GRANTED. The consent decree, as modified, is hereby adopted as an Order of this Court.

ORDERED.